[Crim. No. 3661. First Dist., Div. Two. Feb. 20, 1961.]

THE PEOPLE, Respondent, v. RAWSON McLAIN
WILLIAMS, Appellant.

John J. Fahey and Herbert Chamberlin for Appellant.

Stanley Mosk, Attorney General, Arlo E. Smith and Daniel A. Sharp, Deputy Attorneys General, for Respondent.

KAUFMAN, P. J.—The appellant, Rawson McLain Williams, and George Long, were jointly charged by information with manslaughter (Pen. Code, § 192). Both entered pleas of not guilty and were tried before a jury which found them guilty of involuntary manslaughter. The court denied their motions to reduce the charge to battery, their motions for a new trial, and then granted their motions for probation. The appellant was placed on probation for a period of five years, and as a condition of probation, confined in the county jail for 90 days, plus a fine of $500 with the imposition of sentence suspended during the period of probation. No appeal has been taken by Long. On this appeal from the judgment and from the order denying his motion for a new trial, the appellant Williams contends that (1) the evidence is insufficient to support the verdict; (2) the court erred to the prejudice of the appellant in its instructions to the jury, and in refusing to give the jury a form of verdict for battery; (3) the court

erred in denying the motion for a reduction of the charge to battery.

We regard the following as a fair epitome of the factual situation which resulted in the death of Everett Ghiozzi and led to this prosecution. On Saturday evening, April 19, 1958, the appellant, as on many prior occasions, was serving as the substitute bartender at the Pomar Club, a restaurant and bar located on the corner of Mariposa and Potrero Streets in San Francisco. The appellant arrived at the Pomar Club about 8 :15 p. m. The deceased, Everett Ghiozzi, owned a gas station across the street from the Pomar Club. He usually closed his station about 8 p. m. and was a frequent visitor to the Pomar Club. Ghiozzi was known to the appellant and was a good friend of the codefendant, George Long. There were about 10 to 12 people in the bar during the evening, most of whom knew each other as well as the deceased.

About 9 :30 p. m. Everett Ghiozzi, dressed in his dirty work clothes, entered with a customer. They had a drink or two. After his customer left, Ghiozzi went to the end of the bar to talk to Mrs. Sally Aichlmayr and her companion, Mrs. Root. Mrs. Root was sitting at one end of the bar; Mrs. Aichlmayr was standing up; Mrs. Fenton was sitting near them, on the third stool from the end. Ghiozzi went up and down the bar. Ghiozzi danced with Mrs. Fenton, then left and returned a few minutes later with his dog. The appellant swore at Ghiozzi and told him to remove the dog. Ghiozzi left and came back a few minutes later without the dog, turned to the appellant and said ''Are you happy now?'' According to Mrs. Aichlmayr, Ghiozzi then went up to the appellant and asked if they could be friends and shake hands. The appellant cursed Ghiozzi, served him a drink, and asked for payment.

Ghiozzi then returned to the area of the bar where Mrs. Aichlmayr and Mrs. Root were. Mrs. Aichlmayr was a good friend of the deceased; he had made his home with her and her husband for several years. Mrs. Root lived in the same building with the Aichlmayrs and Ghiozzi and knew him casually. Ghiozzi kept trying to get Mrs. Aichlmayr and Mrs. Root to dance with him; they refused and he kept pestering them. Finally, Mrs. Root was provoked and threw her drink over her shoulder at him. The liquid hit Ghiozzi full in the face and splashed on his glasses. He removed his glasses and then picked up Mrs. Fenton's drink, a green creme de menthe, and threw it at Mrs. Root with the glass. The liquid hit her in the face and also splashed on the wall.

Immediately, the appellant told Ghiozzi to stop and came out from behind the bar, turning the large ring on his finger forward. The appellant grabbed Ghiozzi by the shoulder. Ghiozzi said something like "you're not going to put me out," and held his arms up but did not swing at the appellant. The appellant hit him on the left side of the mouth, said "I'm not going to hit you any more," and returned to his post behind the bar. Ghiozzi stumbled sideways into some chairs and tables, and then landed on his back. He lay on the floor kicking his feet. There was blood on his left cheek. His glasses were on the bar. Ghiozzi then picked himself up, wiped some blood off his face, and returned to Mrs. Aichlmayr and Mrs. Root. Another argument started, and the appellant asked Long to take Ghiozzi outside. Long grabbed Ghiozzi's arms and pushed him outside, over his objections.

They were gone about two or three minutes; then Long returned to the bar, followed by Ghiozzi. Ghiozzi swore at Long and an argument started between Long, Ghiozzi and the appellant. The appellant again asked Long to take Ghiozzi outside. Long hit Ghiozzi on the ear with a closed fist. Ghiozzi fell and hit his head on the concrete floor. Long again took Ghiozzi outside and returned to the bar.

Ghiozzi reappeared a few minutes later with his face washed, and the appellant served him a drink. Ghiozzi and Long began to argue again and the appellant asked Nunez to take him outside. Nunez pushed Ghiozzi all the way outside, but both of them returned a few minutes later. Ghiozzi asked for another drink and was served one by the appellant. Another argument started and Ghiozzi insulted the appellant. The appellant hit him again and tried to push him outside. Ghiozzi tore at the appellant's sleeve and scratched him. After Ghiozzi got up, Nunez again pushed him outside and tried to keep him there. When Ghiozzi tried to come back inside, several of the people in the bar went outside to help.

Outside, Ghiozzi was arguing with Long. Long hit him again and Ghiozzi fell on the sidewalk and hit the back of his head on a car bumper. He lay there motionless for a few minutes and then Long and Nunez dragged Ghiozzi across the street to the service station. Ghiozzi had blood on his face and left ear; he had a cut lip and a cut near his eye. He cursed at them. When Mrs. Fenton and Mrs. Pritchard came to the service station and said they would take care of Ghiozzi, Nunez and Long returned to the bar.

Ghiozzi returned to the bar about 10 minutes later. Every-

one asked him to leave but he refused. Nunez slapped him twice but Ghiozzi did not fall down. Ghiozzi, however, was very unsteady on his feet and fell down twice. He hit his head on the cigarette machine, then stumbled up and fell again by the bowling alley. While he lay on the floor, his whole body was shaking. He asked Nunez to help him home. Nunez braced him under the arms and they began to walk out. As they stepped outside, Ghiozzi asked for his glasses, which were still on the bar. Ghiozzi saw Long a few feet away and grabbed at him. Long hit him and Ghiozzi sat down on the floor. Finally, about 11 p. m., Nunez took Ghiozzi out of the Pomar Club for the last time to Ghiozzi's father's home, which was only a few houses away. The entire sequence of events from the first blow struck by the appellant took from 30 to 45 minutes. Mr. Ghiozzi, Sr., scolded his son and thought he was just badly scratched. As the senior Ghiozzi was busy, a family friend, Mr. Ghirarduzzi, took Ghiozzi to the San Francisco General Hospital with the help of another unidentified person.

Ghiozzi was admitted to the hospital at 11:42 p. m. and first placed in a wheel chair where he slept for about an hour. He did not fall from the chair. When Ghiozzi was taken to the treatment room at the hospital, Mr. Ghirarduzzi left and told Ghiozzi's father that the boy was in a bad way. John Ghiozzi, Sr., went to the Pomar Club and saw the appellant, who admitted hitting Everett. Long and Nunez were there and told Ghiozzi, Sr., that they had tried to stop the fight. Appellant remembered this conversation but not its substance. Ghiozzi, Sr., returned to the hospital with Mr. Ghirarduzzi about 1 a. m. but was not permitted to see his son. When Ghiozzi, Sr., was walking home from the hospital, he met Long. When the appellant and Mr. Fenton closed up the Pomar Club for the night, they found Everett Ghiozzi's glasses on the street outside.

The hospital records indicated that at the time of admission, Ghiozzi had facial injuries and did not appear to be critically injured; there was no bleeding behind the eardrum to indicate a skull fracture. He appeared to be very intoxicated and was so obstreperous that he had to be strapped down in order to be examined and treated. About 1:15 a. m. he wiggled off the examining table, but did not fall on the floor. Between 2:30 and 3 a. m., after his wounds had been treated and X-rays taken, Ghiozzi was put into an isolation room, in a bed which was 6 to 7 inches off the floor. The wet X-rays were read about

2 a. m. and did not indicate a skull fracture. He was asleep and a doctor looked in on him every hour. About 6 a. m., he was quiet; at about 6:50 a. m., the doctor on duty found Ghiozzi lying on the floor dead. The dry X-rays which were read about 7 a. m. clearly showed the skull fracture.

The doctors testified that death had occurred about 6:40 a. m. and had been caused by head injuries with a skull fracture and brain damage or hemorrhage in back of the head; that because the major hemorrhages were older than six hours, the deceased already had the fatal injuries at the time of his admission to the hospital and that the fall from the bed at the hospital did not cause his death. It was not clear whether death would have occurred even if the skull fracture had been diagnosed and treated when the deceased was admitted to the hospital.

The autopsy surgeon testified that the deceased had received about 6 to 10 injuries; that the worst of these had fractured the skull at the back of the head; that either a blow or a fall on the back of the head could have caused the skull fracture. He further testified that any forceful impact to the back of the head could have caused the fatal injury, and that one blow could have caused all the damage, but he could not establish from his examination whether this had in fact happened or whether the other blows did not also successfully contribute to the fatal injury. He stated that the injuries of the deceased could not have been caused by a severe slap on the face, but could have been caused by a blow on the head with a fist. The deceased's blood level of alcohol was 140, which meant that at the time of admission to the hospital, the deceased had had 12 to 15 drinks of 100 per cent proof alcohol. It is clear that neither the appellant nor George Long had any quarrel with Everett Ghiozzi. There is some evidence that the appellant cursed at the deceased, which the appellant denied. There is also evidence that the deceased cursed the appellant. At the time of the incident, the appellant, who was 38 years old, was 5 feet 8 inches tall and weighed about 190 pounds; the deceased was 5 feet 9 inches tall and weighed 135 pounds.

The first argument on appeal is that the evidence is insufficient to sustain the verdict because there is no evidence that any fault or action of the appellant caused the death of Everett Ghiozzi. Appellant argues that the verdict is supported only by evidence of a mere possibility that the action of appellant caused the death of Ghiozzi. The

guiding rule of review as stated in *People* v. *Newland,* 15 Cal.2d 678, 681 [104 P.2d 778], is that before the verdict of the jury, which has been approved by the trial court, can be set aside on appeal on grounds of insufficiency of the evidence, it must be made clearly to appear that upon no hypothesis whatever is their sufficient substantial evidence to support the conclusion reached in the court below. " 'The determination of a charge in a criminal case involves proof of two distinct propositions: First, that the offense charged was committed, and second, that it was perpetrated by the person or persons accused thereof . . . We must assume in favor of the verdict the existence of every fact which the jury could have reasonably deduced from the evidence, and then determine whether such facts are sufficient to support the verdict.' If the circumstances reasonably justify the verdict of the jury, the opinion of the reviewing court that those circumstances might also reasonably be reconciled with the innocence of the defendant will not warrant interference with the determination of the jury. . . .' "

 Section 192 of the Penal Code defines involuntary manslaughter as the unlawful killing of a human being without malice, in the commission of an unlawful act not amounting to a felony; or in the commission of a lawful act which might produce death in an unlawful manner or without due caution and circumspection. As indicated above, the sequence of events at the Pomar Club was related by several eyewitnesses, in addition to the appellant and Long. Naturally, there is conflicting evidence on all salient points. Not all of the witnesses saw the entire series of events. The appellant did not leave the bar and saw every occasion when Ghiozzi was hit or fell down inside. Mrs. Root and Mrs. Aichlmayr left about 10:20 p. m., shortly after the first incident between the appellant and the deceased. Nunez and Long were in the rest room at the time of this incident, and arrived only as it was drawing to a close. The witness Anderson stayed in the Pomar Club most of the time and did not witness all of the incidents which occurred outside.

All of the witnesses agreed that Ghiozzi was drunk when he entered the bar the first time but there is a great deal of conflicting evidence as to his ability to walk and the extent of his belligerency, and his reputation in the community for peace and quiet, when drunk or sober.

The appellant testified that he slapped the deceased only once, with an open hand, after the drink-throwing episode.

Two other witnesses testified that the appellant hit the deceased twice, both times with a closed fist, and that before administering the first blow, the appellant twisted the big ring on his finger to the front. The appellant denied twisting the ring, but admitted that he was wearing the ring and might have cut the deceased. From this, the jury could infer that the appellant was using more force than the situation warranted.

Mrs. Fenton testified that the appellant did not hit Ghiozzi but that Ghoizzi broke loose and fell down while the appellant held him by the shoulder. She did not see Long punch Ghiozzi but did see Long and Nunez drag him to the gas station; she saw Ghiozzi fall once inside and once at the station. Mrs. Pritchard, who was Mr. Nunez's sister-in-law, and had never seen the deceased before that evening, testified that Williams was merely trying to calm down the deceased and did not see him hit the deceased; she also did not see Long hit the deceased inside the bar, but only outside. Ghiozzi was staggering when he came back in and fell down several times but did not hit his head.

The appellant testified that he did not ask either Long or Nunez to take Ghiozzi outside, but that they had volunteered their assistance by their actions. He saw the deceased fall into the cigarette machine and hit his head, then fall twice more, but he did not see the deceased fall to the floor when he hit him and denied making a statement to that effect to the police on the day after the incident. He saw Long hit the deceased only once during the entire evening, and only after the deceased had grabbed Long and called him a dirty name. He also stated that he did not serve the deceased any drinks the entire evening, but allowed the deceased to buy drinks for Mrs. Aichlmayr and others. He did not call the police because Ghiozzi was a regular customer and everyone was trying to get him out.

The witness Anderson testified that Ghiozzi was hit twice inside by the appellant, by Long and by Nunez, and once outside by Long; that Ghiozzi fell down twice inside; Long testified that on the evening in question, he was drunk. He admitted hitting Ghiozzi with a closed fist inside the bar but did not quite remember what happened outside. He stated that Ghiozzi hit him in the left temple and dazed him. He further testified that he never saw the appellant hit the deceased and that appellant never asked him or Nunez to take Ghiozzi out of the Pomar Club.

It was the function of the jury to weigh and evaluate the conflicting evidence and the inferences to be drawn therefrom. Appellant argues that he did not aid or abet Long in causing the death of Ghiozzi but merely struck the deceased to keep order in accordance with his lawful duties as a bartender. The jury could have inferred that the appellant should also have struck Long who was also very drunk and equally disorderly. It was for the jury to decide whether the appellant did ask Long to help, and to decide whether the appellant was a mere bystander or an aider and abettor. (*People* v. *Luna,* 140 Cal. App.2d 662 [295 P.2d 457].)

In the Luna case, the defendant did not strike the victim, but in affirming the conviction of assault, the appellate court pointed out that the defendant Lopez "voluntarily entered into an altercation which would probably lead to trouble, stood by prepared to take a hand in the fight and aggressively entered it when he thought the proper time had arrived. The two stood together and fought together. There was concert of action and purpose which clearly proved Lopez to have been a participant in the entire fight and not a mere inactive and disinterested spectator. It is idle to argue that he was a mere innocent bystander" (p. 665). Similarly, here the jury could have concluded that the appellant was more than an inactive and disinterested spectator or innocent bystander. The jury could also have concluded that when the recurring blows and evictions of Ghiozzi were unsuccessful, the appellant should have called the police even though Ghiozzi was a regular customer.

Section 1958 of the Code of Civil Procedure defines an inference as "a deduction which the reason of the jury makes from the facts proved, without an express direction of law to that effect." Section 1960 of the same code provides that an inference must be founded on a fact legally proven and such a deduction from a fact as is warranted by a consideration of the usual propensities or passions of men, the particular propensities or passions of the person whose act is in question, the course of business, or the course of nature.

Weighed in the crucible of both law and reason and in the light of the above quoted code sections and rules of appellate review, we are persuaded that under the facts and circumstances of the instant case, the jury properly inferred that the acts of the appellant were committed with a lack of care and caused the death of Everett Ghiozzi.

The next argument on appeal is that the trial court

improperly denied appellant's motion to give the jury a verdict form for the lesser included offense of battery. A similar argument was raised in *People* v. *Gonzales*, 187 Cal.App.2d 846 [10 Cal.Rptr. 12], wherein the defendant was found guilty of a violation of the sale of narcotics. Three forms of verdict were submitted to the jury: guilty of sale, not guilty of sale, guilty of possession. The appellant argued that because the court did not give to the jury a form of verdict that he might not be guilty of the lesser included offense of possession, it was virtually an expression of the court's opinion that the appellant was guilty of possession. In rejecting this contention, the appellate court pointed out that no objection was raised to the forms of verdict submitted, and that defense counsel expressly assented and then stated the rule first announced in *People* v. *Hill*, 116 Cal. 562 [48 P. 711]. In that case, the defendant was convicted of murder in the first degree, and argued on appeal that the court committed prejudicial error by failing to submit a form of verdict for murder of the second degree, as by reason of such omission the jury was not given the opportunity to find a verdict of murder in that degree. ▮ The court said at page 570:

"Whether the omission was inadvertent or intentional does not appear, although from the fact that that degree of the offense was covered by the charge, and that a form of verdict for manslaughter was furnished to the jury, it is highly probable that the omission was unintentional. However that may be, we do not ascribe any such effect to the omission as that suggested by defendant. The law makes it no part of the duty of the judge to furnish forms of verdict to the jury, but the latter are presumed to be able to formulate their own conclusions, and in practice most usually do so. Where, therefore, the jury has been properly instructed as to the different degrees of the offense, it must be presumed that if their conclusion called for a form of verdict with which they were not furnished, they would either ask for it or write one for themselves. It certainly could have no necessary tendency to preclude them from finding such verdict."

The rules are sound and give the jury a maximum amount of freedom in their deliberations. If the jury should reach a verdict not substantiated by the evidence, it is the duty of the court to correct their understanding and instruct them to resume their deliberations. (*People* v. *Scott*, 53 Cal.2d 558 [348 P.2d 882].)

Section 1159 of the Penal Code provides: "The jury, or the

judge if a jury trial is waived, may find the defendant guilty of any offense, the commission of which is necessarily included in that with which he is charged, or of an attempt to commit the offense.''

A lesser offense is necessarily included if it is within the offense specifically charged in the accusatory pleading, even though its elements are not necessarily in the statutory definition of the crime. (*People* v. *Ray,* 162 Cal.App.2d 308 [328 P.2d 219] ; *People* v. *Marshall,* 48 Cal.2d 394 [309 P.2d 456].) The next question, therefore, is whether under the facts of this case, battery is necessarily included in the offense of involuntary manslaughter. The test in this state of a necessarily included offense is simply that where an offense cannot be committed without necessarily committing another offense, the latter is a necessarily included offense. (*In re Hess,* 45 Cal.2d 171, 174 [288 P.2d 5].) Involuntary manslaughter is defined by Penal Code, section 192 [subd. 2], as the unlawful killing of a human being in ''the commission of an unlawful act, not amounting to felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection; provided that this subdivision shall not apply to acts committed in the driving of a vehicle.''

The crime of battery is defined as ''any wilful and unlawful use of force or violence upon the person of another.'' (Pen. Code, § 242.) It would appear that the lack of wilfulness, which is the most significant element of involuntary manslaughter, is at war with the *wilful* and unlawful use of force which is the crucial element of a battery. We conclude that the latter offense, therefore, is not necessarily included in the former, under the facts of this case. We think the instant case falls under the well settled rule that the trial court may properly refuse to instruct on a lesser offense where the evidence is such as to make it clear that if the defendant is guilty at all, he is guilty of the higher offense. (*People* v. *McCoy,* 25 Cal.2d 177 [153 P.2d 315].) Therefore, we conclude that in view of the evidence which is consistent only with involuntary manslaughter or innocence, the trial court's refusal of the form of verdict for battery was proper and could not possibly have been prejudicial to the appellant. If it were otherwise, we would have to open up the Pandora's box of wilful and intentional homicides—which would then exclude involuntary manslaughter.

We turn now to the appellant's argument relating to various

errors in the court's instructions to the jury. We note that this appeal is on the judgment roll and the instructions given and refused are not before us.* However, the particular arguments raised do not necessitate a reading of the instructions, so in the interest of fairness, we will discuss them briefly.

 The first argument is that the trial court admitted evidence as to oral admissions made by the appellant but did not instruct the jury that such admissions must be viewed with caution. Appellant relies on *People* v. *Koenig*, 29 Cal.2d 87 [173 P.2d 1]; *People* v. *Letourneau*, 34 Cal.2d 478 [211 P.2d 865]; and *People* v. *Bemis*, 33 Cal.2d 395 [202 P.2d 82]. However, in the former two cases, the convictions were affirmed despite the absence of the cautionary instruction. In *People* v. *Bemis*, 33 Cal.2d 395 [202 P.2d 82], the conviction for burglary was reversed because of the court's failure to instruct the jury to use caution in viewing the admissions of the accomplice. However, in that case, the prosecution relied entirely upon the admissions of the accomplice and the defendant denied the burglary. In the instant case, the prosecution relied on eyewitnesses and the appellant did not deny any of the essential facts established by the eyewitnesses. The admissions complained of merely reiterate the testimony of the appellant and were used for purposes of impeachment. We do not think that the failure to give the cautionary instruction was prejudicial under these circumstances.

 It is next argued that the court erred in instructing the jury on the law of aiding and abetting in terms of CALJIC Numbers 91 and 91-E. We have looked at the formula instructions and they are a proper statement of the law. Appellant argues that these instructions on the subject were improper as they were not warranted by the evidence. We cannot agree. As we have indicated above, there was evidence that the appellant asked Long to remove Ghiozzi. Thus, the question was one for the jury under proper instruction. (*People* v. *Luna, supra.*)

 The next argument is that the trial court erred in failing to instruct the jury on battery. We note that the record before us indicates that the appellant did not request

---

*In his opening brief, appellant expressed an intention to make a motion for augmentation of the record to include this material. This intention has not yet manifested itself in action. However, as discretion is the better part of valor, the issues relative to instructions have been briefly treated. Furthermore, it is likely that if made, the motion will not be opposed by the attorney general, who has answered the contentions relating to instructions in his brief.

instructions on battery [e.g. the ruling on the form of verdict was not a ruling on the instructions (*People* v. *Barrios,* 52 Cal.App. 528 [199 P. 58])], so that the question is whether the trial court erred in failing on its own motion to instruct the jury on battery. ▮ It is well settled that a court need not instruct the jury on every theory reasonably derived from the offense unless it is so requested by counsel. (*People* v. *Beasley,* 163 Cal.App.2d 22 [328 P.2d 834].) ▮ Furthermore, while duly watchful of a trial court's duty in a criminal case to give, on its own motion, all of the instructions consistent with the evidence, our Supreme Court has also counseled against the giving of instructions not justified by the facts of the case as tending to overburden and confuse the jurors. (*People* v. *Wade,* 53 Cal.2d 322, 333 [348 P.2d 116].)

▮ The final argument is that the trial court erred in denying the appellant's motion for a reduction of the charge to a battery. As we have concluded above that there was sufficient evidence to sustain the verdict of involuntary manslaughter, the denial of the appellant's motion was within the proper discretion of the trial court.

No prejudicial error appearing in the record before us, the judgment and order denying the motion for new trial must be and they are hereby affirmed.

Draper, J., and Shoemaker, J., concurred.