[Crim. No. 1499. Fourth Dist. Sept. 7, 1962.]

THE PEOPLE, Plaintiff and Respondent, v. LEONARD R. CHAPMAN, Defendant and Appellant.

Sankary, Sankary & Horn and Morris Sankary for Defendant and Appellant.

Stanley Mosk, Attorney General, and Norman H. Sokolow, Deputy Attorney General, for Plaintiff and Respondent.

GRIFFIN, P. J.—In count one of the indictment, Dr. Leonard R. Chapman (hereinafter referred to as defendant), Bertha L. Underwood and Walter Schroeder were accused of conspiring to violate Penal Code, section 484 (theft), Health and Safety Code, sections 26285 (adulterating and misbranding a drug or device), 26286 (disseminating false advertising about a drug), and 26286.5 (advertising a drug represented to have affected certain diseases) and Business and Professions Code, section 17500 (disseminating untrue or misleading statements). The indictment set forth 12 overt acts allegedly committed during this conspiracy. In count two, the same defendants were accused of grand theft in violation of Penal Code, sections 484 and 487, in that they took more than $200 from Harry and Rettie Mae Patous. In count three, the defendants were charged with grand theft, in violation of Penal Code, sections 484 and 487.1, in that they took more than $200 from Joseph T. Johnson.

After a jury trial, Chapman and Underwood were found guilty as charged. Defendant made a motion for a new trial, which was denied. The court suspended imposition of sentence for 10 years on condition that defendant not engage in the

practice of medicine or other form of treatment of the sick during the term of probation. He appeals from the order granting probation. (Pen. Code, § 1237.) Underwood has not appealed.

The conviction was based upon the following evidence. Defendant is a licensed medical doctor and practiced in Vista, California. Underwood worked in his office as a receptionist and nurse. Routinely, she assisted defendant in the use of certain machines and in the administration of "Koch" shots. Several machines or electrical devices which were found in defendant's office by officers during a search conducted after his arrest were received in evidence. One of these devices is the "diagnostic" machine. It is generally rectangular in shape, 25 inches long, 10 inches high and 11 inches deep. It has handles on each end and an attached electrical cord with an ordinary electrical plug at the end. On the face of this machine, there are two needle gauges, 10 small adjustable dials, four larger dials, three on-off switches, a removable fuse, several small lights and some sockets or jacks for receiving plugs attached to electrical wires which were also seized with the machine. A small flat plastic plate is located on the ledge in front of the face of the machine.

Before the trial, this machine was examined by Dr. Moses A. Greenfield, a physicist employed as a professor of radiology at the Medical Center at the University of California at Los Angeles. He said that the machine was designed so that when the attached electrical cord was plugged into an ordinary house current (such as was available in the defendant's office), a regular 60-cycle alternating current flowed through part of the machine, but no current reached the jacks used to connect the wires attached to various plates to the machine. In other words, it was physically impossible for this machine to transmit or receive impulses of any kind via the jacks used to connect the patients to the machine.

Dr. Greenfield also examined several other machines, smaller in size, which were seized in defendant's office. These devices were encased in what resembled small pieces of luggage, of the type commonly called "train cases." Inside these cases, there is an electrical cord which passes through a panel fitted flush with the inside of the case near the top. Attached to this panel, there is a dial, a plug-in jack and other switches, lights and paraphernalia. Dr. Greenfield examined the circuitry of these devices and found it to be simpler but similar to that of the diagnostic machine. He testified that none of these ma-

chines could possibly serve any useful purpose in diagnosing or treating illnesses of human beings. He testified that the only methods currently useful in the treatment of cancer cells are exposing them to ionizing radiation or removing them by surgery. He said that recent researches have created the hope that certain chemical actions may be useful in the treatment of cancer, but as yet the fundamental cause of cancer and its treatment have not been learned. He testified that the 60-cycle stray radiation which these machines might give off would have no effect either on healthy or cancerous cells in the human body.

Joseph Thom, the chief food and drug chemist of the State Department of Public Health, testified that he examined the contents of an ampule which was labeled "Glyoxylide, 12X, sterile." He found one reference to Glyoxylide in medical literature. There, it was described as a medicinal "catylist" [sic], synthesized by obscure methods and promoted as an adjunct in the therapy of cancer and other ailments by W. F. Koch. Utilizing various tests, the witness examined this liquid and found it to be indistinguishable from distilled water.

Harry Johnson, a criminalist in the Bureau of Criminal Identification of the Department of Justice of the State of California, was qualified as an expert chemist skilled in the identification of unknown substances. He examined the contents of a syringe seized from defendant's office at the time of his arrest and also the contents of a small glass ampule. In measuring the contents of the syringe, Mr. Johnson found that it contained .01 per cent alcohol by weight. Because of the small amount of material, he could not identify the nature of a solid material which was present in the amount of one part per thousand in the contents of the syringe. In Mr. Johnson's opinion, the bulk of the liquid material in the syringe was water. The small ampule contained a label which mentioned sulphuric acid. Mr. Johnson examined the ampule's contents and found no sulphate precipitant.

Joseph T. Johnson testified that he was 76 years old and had consulted defendant in September 1958, giving a history of pain on the right side of his abdomen. Defendant examined Johnson, using a machine which resembled the diagnostic machine received in evidence. Underwood assisted in this examination, reading numbers from a book. Defendant adjusted dials on the machine during this diagnosis. After the examination, defendant told Johnson that his liver and spleen

564

were bad and that he had virus cancer. Defendant said that he
could cure these conditions with a shot which cost $100. Mr.
Johnson paid $100 for the shot and $10 for the examination.
For six months, Mr. Johnson returned to defendant's office for
daily treatments. On Mondays, he received a treatment which
cost $3.00 and on the other days Underwood administered the
treatments on smaller machines which resembled the treatment
machines received in evidence. The treatments on the smaller
machines cost $2.00 each. During these treatments, a copper
plate was put on Mr. Johnson's body over the area to be
treated. The plate was attached to a machine. He could feel
nothing during the treatment. He received some booster shots
which cost $10. Mr. Johnson stopped going to defendant in
March 1959. During the six months he was receiving these
treatments, his condition did not improve. Altogether, Mr.
Johnson paid defendant and Underwood $373.

On December 14, 1959, Rettie Patous, wife of Harry Patous,
went with her husband to defendant's office. Mr. and Mrs.
Patous told defendant that Mr. Patous had cancer and that he
had been operated on in a hospital and discharged. They
came to defendant to obtain treatment for Mr. Patous' back
and hip, which were painful. Mr. Patous was connected to a
machine similar to the diagnostic machine received in evi-
dence. Defendant sat at the machine and turned certain dials.
Underwood sat at a nearby desk and called out numbers from
a small book. Defendant repeated the numbers and turned the
dials on the machine. The procedure took about an hour.

After the diagnosis, defendant told Mr. Patous that he was
suffering from 23 different ailments. Defendant referred to
the heart, spleen, liver, colon, arthritis, neuritis, staphylococ-
cus and cancer. He said that in view of the seriousness of Mr.
Patous' condition, a Koch shot would be the best treatment.
Defendant said the shot would cost $100. This sum was paid
and the shot was administered. Thereafter, Mr. Patous was
given treatments in defendant's office. In these treatments,
the smaller machines were used. These treatments lasted about
an hour. During the treatment, Mr. Patous would sit in a chair
holding a lead plate in his hand. Three or four organs would
be treated during each session. Each one would receive a treat-
ment ranging from 15 minutes to perhaps half an hour.

During her husband's second visit to defendant's office, Mrs.
Patous received a diagnosis on a machine similar to the one
previously used on her husband. Afterward, defendant told
her that she was suffering from 13 illnesses involving the liver,

heart, bladder, and a brain tumor. Defendant recommended that Mrs. Patous receive the same treatments being given to her husband. Accordingly, they were treated together.

When Mr. Patous became worse and could not come into the office, arrangements were made to rent one of the smaller machines for $1.00 per day. When defendant made a diagnosis at the house, the fee was $5.00. The Patous paid defendant a total of $234.50.

During their conversations, defendant told Mr. and Mrs. Patous that there was no known cure for cancer, but he said that he believed that staphylococcus germs were the cause of cancer and that the Koch shot would arrest the staphylococcus infection and thus retard the cancer. Mrs. Patous said that her husband seemed to sleep better after beginning these treatments and he also performed some of his bodily functions more easily. Defendant gave Mr. Patous an adjustment and prescribed Empirin and medicine to remove the swelling from his feet. Mr. Patous died on March 19, 1960. Since the time defendant told her that she had a brain tumor, Mrs. Patous had never had any surgery performed on her head.

Mrs. Leontyne Manning went to defendant's office in the fall of 1957 to obtain an osteopathic adjustment for a stiff neck. Defendant asked her how long she had been ill. She said that she was not ill but she wanted an adjustment. Defendant said she would have to have an examination first. Mrs. Manning sat down and defendant adjusted some dials on the machine and called out some numbers. Underwood took the numbers down. Then defendant told Mrs. Manning that she had cancer of the liver and kidneys, but she should not worry because he had a cure for cancer. Mrs. Manning went to another room and while there Mrs. Underwood told her not to worry, that she herself (Mrs. Underwood) had had cancer and defendant cured her with treatments which cost $100 initially and by weekly treatments costing three or four dollars each. Mrs. Manning paid three or four dollars for the examination, left the office and never returned.

Mrs. Cora Corns went to defendant's office and asked Underwood for an osteopathic treatment for a sore hip and leg. After a few minutes, she was admitted to defendant's examining room where defendant was sitting before a machine similar to the diagnostic machine received in evidence. Underwood also entered the room. Mrs. Corns was handed a metal plate which was attached to the machine by a wire. Underwood began reading a list of the organs of the body. Defendant adjusted

the dials on the machine and called out numbers which Underwood wrote down on a chart. While he was doing this, defendant would shake his head and say that it was terrible, or it was too bad. Finally, he told Mrs. Corns that the machine showed that she was full of malignant virus from her head to her toes. He said that it was not cancer but that it was the beginning of cancer. Defendant mentioned Mrs. Corns' colon and she said that a year previously she had had an operation for polyps there which were malignant.

Mrs. Corns was asked to hold a bottle of clear liquid in her hand while she held the plate in the other hand. Defendant looked at the machine and said that she was going to have to have a Koch shot. He said that in a short time the virus would spread and then there would be no hope. He said that the doctors in Los Angeles got five to eight hundred dollars for this shot, but that he only charged $100, which was barely enough to cover the cost of the medicine and he did this for the benefit of his patients.

Mrs. Corns asked about the pain in her hip, which was her original complaint. Defendant had her lie on the table; took a small hand massager and rubbed it up and down her hip and leg a few times. Then Mrs. Corns was taken into another room where she was told to lie down. Underwood put a plate on Mrs. Corns' abdomen. This plate was attached to a small machine similar to the treatment machines received in evidence. After Mrs. Corns had been in this position for 30 minutes, another person was brought in by Underwood. Underwood asked Mrs. Corns to sit in a chair and hold the plate up to her ear. This she did for another half hour. Then Underwood gave Mrs. Corns a diet book, some tablets, and told her to drink nothing but apple juice until she returned the following day for her Koch shot.

Mrs. Corns said that she didn't know if she could get the $100. Underwood then took back the tablets and the diet book and told Mrs. Corns that she would not need these right away. She also said Mrs. Corns would have to take the shot immediately or there would be no help at all. She said that six or seven thousand people died every month from this virus. A friend of Mrs. Corns who had accompanied her asked Underwood if she meant cancer. Underwood replied that she was referring to the malignant virus and that it was a horrible death. She said that without the shot neither radium nor surgery would be able to help Mrs. Corns and not even God would be able to help her. Mrs. Corns was also told that she

would have to receive treatments each day for two weeks on a machine which could be rented for $1.00 per day. Mrs. Corns did not return for the Koch shot.

Thomas Crane went to defendant's office around March 1, 1960. He was bothered by dizzy spells. Defendant said he should be tested and gave him a metal plate to hold in his hand. This plate was connected to a machine similar to the diagnostic machine received in evidence. This test lasted for 10 or 15 minutes. After it was over, defendant told Mr. Crane that he had a heart condition and an infection. Defendant referred to this infection with a long name and said it was the same kind of disease that the babies in the Texas hospital died of. Defendant recommended a Koch shot to get rid of the ''malignancy'' and clear up the infection. This shot was given to Mr. Crane and he paid $100 cash for it. Mr. Crane also received some ''electrical'' treatments. He went to defendant's office about 14 times altogether. Then he was checked again on the diagnostic machine. Defendant told him that everything was cleared up and Mr. Crane told defendant that he was feeling a little better.

Mrs. Lorrean Hubbard, an undercover investigator for the State Board of Medical Examiners, went to defendant's office on March 25, 1960. She was accompanied by Mrs. Hazel Hotz, who also was there in the capacity of an undercover investigator.

Mrs. Hotz told defendant that she had been bothered by a pain in her chest. Defendant seated Mrs. Hotz near the diagnostic machine. He told her that the machine could be compared to a radio or television, since it could receive invisible signals. He said that Mrs. Hubbard should not sit next to Mrs. Hotz because that would interfere with the latter's ''vibrations'' and prevent the machine from giving a true diagnostic report. Defendant handed Mrs. Hotz a small metal plate connected to the machine by a wire. He told her that it was electronic, not electrical; that she would receive no sensation from it and that she should just hold it in the palm of her hand and relax. Then Underwood called out a series of numbers and letters. Defendant repeated them and rubbed the fingers of his hand on a plastic disk on the machine. At the same time, he turned dials on the machine with his left hand. At one point, defendant said that Mrs. Hotz had a serious kidney condition. At the conclusion of the examination, defendant told Mrs. Hotz that she had no malignancies but that she did have both streptococcus and staphylococcus infections. He said that

she should have an osteopathic treatment once a week and an hour of electronic treatment five days a week. These treatments would cost a total of $13 per week. He also said that periodically he would check her on the diagnostic machine to see how she was doing.

Then Mrs. Hubbard was examined. The same procedure was followed. After this examination, Mrs. Hubbard and Mrs. Hotz engaged defendant in a conversation. They claimed that their aunt had a great fear of malignancy but was afraid of doctors. Defendant said that the law would not permit him to discuss one patient with another, but that Mrs. Underwood could tell them the real story. Then defendant was asked if he used the electronic machine for malignancy or what method was used. He said that he first used the Koch shot. Mrs. Hotz asked him what it was and he said it was a shot that was given in the muscles of the hip. He said that he was not the only one who used these shots, that they were used in Los Angeles, but that people there had to pay $600 for them. In response to further questioning, he said that he charged $100 for the shots and was able to do this because he bought them in large quantities, that generally one shot was sufficient unless it was an advanced case where the patient might have to have as many as six shots. Defendant told them that their aunt would definitely be cured if she came to him, ''like dozens of others.'' They asked defendant what they owed him for the examinations and he said it would be $10 each and for them to pay Underwood on their way out. He suggested that they have an osteopathic treatment that afternoon, but Mrs. Hubbard objected because it was late.

On their way out, Mrs. Hubbard and Mrs. Hotz paid Underwood $10 and asked for a receipt. Underwood said she would gladly give them one, but if they wanted one in the future they would have to ask for one each time because she kept no records. There was some disagreement as to a time for an appointment. Underwood told Mrs. Hotz that she thought she was taking her condition too lightly, stating that she recalled that defendant had said that Mrs. Hotz had both strep and staph virus and that the germs could multiply 15 times every five minutes. Underwood also told Mrs. Hubbard that she did not believe Mrs. Hubbard realized how serious her condition was and that she should start the treatment at once.

Mrs. Hubbard told Underwood that defendant said that she could tell them the real story. Underwood said that she would be glad to. She related that she had had cancer a number of

years previously and was admitted to a hospital in Georgia but did not respond to treatment, and then moved to California where she was in a hospital but was so sick that she could not be operated on. She said then her family heard of defendant and they took her to him and that she took six of the Koch shots and these cured her and then defendant hired her as his nurse and assistant.

Defendant's first contention is that count one of the indictment (the conspiracy count) is defective because it does not allege that at the time the false pretenses and promises were made, the defendants knew they were false. Count one in part stated:

''[Defendants] are accused by the Grand Jury of the County of San Diego, by this Indictment of the crime of Criminal Conspiracy to Cheat and Defraud by Criminal Means and to Obtain Money and Property by False Pretenses and by False Promises with Intent Not to Perform Such Promises in Violation of Section 182 Subdivision 4 of the Penal Code of the State of California, a felony, committed prior to the finding of this Indictment as follows: The said [defendants], in the County of San Diego, State of California, did, on or about April 30th, 1957 and continuously thereafter until the filing of this Indictment, feloniously and knowingly conspire, combine, confederate and agree together and with each other and with one WILLIAM HAINES and with divers other persons all of whose names are to the Grand Jury unknown, to cheat and defraud by criminal means and to obtain property by false pretenses and by false promises with intent not to perform such promises, and did agree to use and did use the following criminal means: . . .''

Defendant cites *People* v. *Campbell*, 1 Cal.App.2d 109 [36 P.2d 198], in support of his contention. That case involved an information which stated that one of the defendants knew of the falsity of the promises, but the information pointedly omitted in the allegation that the other defendant had such knowledge. The indictment here contains no such defect. Penal Code, section 952, provides:

''In charging an offense, each count shall contain, and shall be sufficient if it contains in substance, a statement that the accused has committed some public offense therein specified. Such statement may be made in ordinary and concise language without any technical averments or any allegations of matter not essential to be proved. It may be in the words of the enactment describing the offense or declaring the matter to be a

public offense, or in any words sufficient to give the accused notice of the offense of which he is accused. In charging theft it shall be sufficient to allege that the defendant unlawfully took the labor or property of another.''

■ An indictment is sufficient under present-day rules of criminal pleading if it contains words adequate to give the accused notice of the offense with which he is charged. (*People* v. *Mason*, 184 Cal.App.2d 317 [7 Cal.Rptr. 627].) Notice of the particular circumstances of the offense is given by the transcript of the evidence before the grand jury or the committing magistrate, not by complex and detailed pleadings. (*People* v. *Roberts*, 40 Cal.2d 483 [254 P.2d 501].) Defendant's contention that the indictment is defective is without merit.

Defendant also urges that the court erred in allowing the physical evidence seized at the time of his arrest to be admitted. He bases this contention on the theory that the search warrant was improperly issued. His main arguments are that the dates are not sufficiently set forth in the affidavit supporting the search warrant and the facts set forth therein do not allege the commission of a crime or fraud. He also suggests that the warrant was not issued to a person authorized to execute it.

■ The record indicates that the search warrant was issued to any ''Peace Officer in the County of San Diego,'' and it was executed by Kenneth Kloster, who was then an investigator for the Board of Medical Examiners. Penal Code, section 1528, provides that the magistrate issuing a warrant must direct it to a peace officer in his county. Penal Code, section 7, subdivision 8, and section 817, provide that investigators for the Board of Medical Examiners are peace officers when carrying out the duties of their employment. Kloster was acting pursuant to the duties of his employment when he served the search warrant. It therefore appears that the warrant was properly directed to a peace officer and Kloster was authorized to execute it. An examination of the affidavit supporting the warrant reveals that it alleges in detail facts sufficient to lead a reasonable man to believe that the offense specified was being committed and that the property described was being used in the commission of a felony. Therefore, the search warrant was properly issued and executed and the property seized was admissible into evidence. It also appears that defendant was arrested pursuant to a warrant before the search was made. This arrest occurred on the premises which

were searched. ▮▮▮ The search can also be justified as incident to a lawful arrest, since, under these circumstances, a reasonable search can be made of the premises under the suspect's control at the time of his arrest and any articles which have been used by him to commit the crime for which he was arrested, or which constituted evidence of the crime, can be seized. (*People* v. *Winston,* 46 Cal.2d 151, 162-163 [293 P.2d 40].)

Defendant's next contention is that the trial court erred in excluding proffered testimony of patients of the defendant, which testimony, if admitted, would have been to the effect that the patients were benefited or cured by treatments given them with the diagnostic and treatment machines and by the Koch treatment. Defendant says that the patients would further have testified that they told him they were so benefited or cured, which testimony was relevant to the issue of defendant's intent to defraud. It is true that the court refused to permit defendant to introduce the testimony of several of his former patients and that defendant made an offer of proof indicating that their testimony, if received, would have been as above indicated. However, considerable testimony was received on these issues.

The defendant himself and Underwood testified that defendant's patients told him that their condition was improved by the treatments they had received. Defendant testified that he believed these statements. Additionally, Underwood testified that she herself had been treated by defendant, both with the Koch treatment and the machines, and that her condition was markedly improved after these treatments. Another witness testified that he took machine treatments from defendant and had not been bothered by blackouts since then. A witness testified that after receiving a machine treatment from defendant for a cold, she was helped and she told defendant of this result. A Mrs. Wilson testified that her daughter recovered from severe attacks of dysentery after being treated on defendant's machines. A prosecution witness, Mrs. Patous, testified that after her husband received the machine treatments and the Koch shot, his condition was improved. Another prosecution witness, Mr. Crane, testified that after receiving the machine treatments and the Koch shot, he told defendant that he was feeling a little better, as in fact he was. A character witness, Mrs. Bovier, testified that she would continue to go to defendant as a doctor.

In addition to the foregoing testimony by lay witnesses

who had been defendant's patients, the defense offered the testimony of two experts. James Riggs, a holder of a Ph.D. degree in physics from Texas A & M, and a physics instructor at La Sierra College, testified as to the construction and working of the diagnostic machine. He said that it produced some electrical energy, but that the current emanating from the machine was in the micro-ampere range. (A micro-ampere is a millionth of an amp.) This witness disclaimed any knowledge as to whether or not the machine would have any effect on human beings, saying that this area was outside the field of his professional skill. On cross-examination, he said that the coils in the machine were a crude form of electrical transformer with an air core; that the coil arrangement created an extremely small amount of electrical current in the ''open'' circuit to which the wires touched by the patients were connected. He said that the frequency of this current was slightly different from the normal 60-cycle frequency in house current because the transformer arrangement did not have a metal core such as is necessary to transform frequencies efficiently. He admitted that the current emanating from the machine was many times less than that created by the normal two-cell flashlight.

The other expert witness produced by the defendant was Dr. John Gozzi, a graduate of the National College of Chiropractic and Drugless Physicians and a member of the board of the Electronic Medical Foundation in San Francisco. Dr. Gozzi testified that he practiced his profession in Tucson, Arizona for five years and in San Diego for five years. He said that he had also been a radio amateur since 1933. He admitted that he had stopped practicing his profession and was in the home-building business at the time of trial. He said that he had made a study of electronic medicine but that most of his experience with it was clinical experience. He said, ''I have not conducted what you might term scientific experiments under rigidly controlled conditions.'' Dr. Gozzi testified that a practitioner in the electronic medicine field acquires the necessary skill by an apprenticeship with another practitioner. He said it took him approximately one month of intensive training to develop a sensitivity to the feel or pull upon the fingertips which is transmitted by the diagnostic machine. On cross-examination, Dr. Gozzi testified that each human cell contains electricity and this is direct current. However, he said that in his opinion there is also another type of electricity in the cell and that this second type of

electricity has a frequency or alternating current. He compared this concept with the fact that a crystal goblet can be shattered by a harmonic resonance. He said that there is a certain critical frequency and energy which can affect the cell and that bacterial cells can be destroyed through the use of this type of energy. He said, in summary, that in his opinion radionics analysis is valuable as an adjunct in determining the condition of the patient and in the treatment of any diseases discovered.

It is apparent that the testimony of the lay witnesses which was offered by defendant was intended to have a two-fold effect. First, defendant wanted to show that these people felt better after receiving their treatments and thereby prove that the machines and the Koch treatment had some beneficial effect. Secondly, he wanted to show that his patients told him that they felt better and he therefore believed in the effectiveness of the machines. This proffered testimony would however be irrelevant as to the question of whether or not the machines assisted defendant in making correct diagnoses. This aspect of the machines' use could only be proven by expert testimony such as was offered and received on behalf of both the prosecution and the defense, or by the results of clinically-controlled experiments. The laymen and patients would not be able to evaluate the diagnostic significance, if any, of the machines. ■■■ Expert testimony is required where the facts from which the conclusions are to be drawn are peculiarly within the expert's knowledge and are not a matter of common knowledge. The case of *People* v. *Walker*, 69 Cal.App. 475, 494-495 [231 P. 572], cited by defendant, involved the issue of the efficacy of defendant's treatments as bearing on the falsity of her representations that she was a faith healer. So far as is known, faith healing is not a matter upon which expert testimony is available. Therefore, the truth or falsity of the representations in that case could only be proved circumstantially by testimony of former patients that they had been cured or not cured by the defendant. ■■■ In this case, the machines and illnesses involved are subjects upon which experts have acquired a great deal of knowledge which is not possessed by the average layman. The relative value of the testimony of an expert, contrasted with that of the layman is apparent. The trial court's decision to limit the testimony of lay witnesses and accept the testimony of experts lay within the area of the court's discretion.

In any event, a substantial amount of testimony from lay witnesses, to the effect that they felt better after receiving defendant's treatment, was received and no doubt considered by the jury. Defendant's testimony that his patients had told him that they were benefited by his treatments was not contradicted. ▮ It is a well-established rule that the exclusion of evidence will not be considered prejudicial where other evidence to the same effect has been received. (*People* v. *Brust*, 47 Cal.2d 776 [306 P.2d 480].)

▮ Defendant also contends that the court erred in refusing to let him conduct an experiment in the presence of the jury. This demonstration was designed to prove that if earthworms were placed in a small container attached to one of the machines under consideration, they would be killed in about four hours. The court refused to permit the experiment, stating that the jurors could not draw therefrom any inference as to the therapeutic value of the machine. Defendant testified that he had conducted such an experiment, with the aforementioned result. As was said in *People* v. *Skinner*, 123 Cal.App.2d 741, 751 [267 P.2d 875]:

". . . Today it is fundamental law that it is within the sound discretion of the trial court to determine whether or not an experiment will aid or confuse the jurors."

▮ Defendant contends that the evidence is insufficient to sustain the verdict. In analyzing the evidence, we have dealt with a reporter's transcript of 2,045 pages and briefs totaling 249 pages. Having found the evidence to be sufficient, we are not under obligation to review the same in detail in an effort to convince counsel of the soundness of our conclusion. In *Pores* v. *Purity Milk Co.*, 135 Cal.App.2d 305, 309 [287 P.2d 169], it is stated:

"It is not the province of a reviewing court to comment on each evidentiary conflict or disagreement or to present a detailed argument on the sufficiency of the evidence to support the findings.

The evidence has been examined in the light of the rules laid down in *People* v. *Newland*, 15 Cal.2d 678, 681 [104 P.2d 778], and *People* v. *Daugherty*, 40 Cal.2d 876 [256 P.2d 911].

▮ Accordingly, we must assume in favor of the verdict the existence of every fact which the jury could have reasonably deduced from the evidence and then determine whether such facts are sufficient to support the verdict. ▮ If the circumstances reasonably justify the verdict of the jury, the opinion of the reviewing court that these circumstances might also be reconciled reasonably with the innocence of the de-

fendant will not warrant interference with the verdict. It is our conclusion, after reviewing the evidence, that the jury was justified in believing that the treatment diagnostic machine, the treatment machine and the Koch treatment were entirely worthless and without any medical value, and that defendant and Underwood knew this to be true; that they misrepresented the efficacy of these treatments to the defendant's patients and that, by means of these false pretenses and misrepresentations, extracted money as charged in counts two and three. The fact that the defendant and Underwood conspired together to commit the offenses charged in count one is also affirmatively shown by the evidence. Underwood was not given the ordinary W-2 form which is required to be given by an employer to an employee receiving more than $56 per month. (26 U.S.C.A. § 3402.) From this and other facts, it can be inferred that defendant and Underwood were partners. Nor did Underwood tire in her efforts to induce defendant's patients to receive the Koch shots and the treatments. She told patients her story concerning her own ''happy'' results, and, this failing, she would come forward with a terrifying description of the awful fate that awaited any who did not immediately obtain the necessary treatments. However, her concern did not go so far but that she immediately recovered the booklet and pills which were given to Mrs. Corns when she discovered that that patient might not have the money necessary for the Koch shot. The nature of the business is illustrated by Mrs. Underwood's statement that she did not keep records. Another illuminating fact was revealed on rebuttal by one of the officers who participated in the search of defendant's offices after his arrest. At the time of the arrest, defendant was ready to administer a Koch shot which had been put in the hypodermic syringe in another room by Underwood. Defendant testified that all Koch shots came in small glass ampules, but a search of the office after the arrest failed to reveal a broken ampule. However, a bottle of water was found standing on the sink in the room in which the shot had been put in the syringe. It might be inferred that the substance in the syringe was water. In any event, the amount of Glyoxylide in the Koch shot was said to be one part in a trillion, so the difference between the shot and distilled water would be slight. The evidence amply supports the conclusions reached by the triers of fact. (*People* v. *Schmitt*, 155 Cal. App.2d 87 [317 P.2d 673] ; *People* v. *Galway*, 120 Cal.App.2d 45 [260 P.2d 212].)

Defendant next contends that he was prejudiced by a ruling sustaining an objection by the prosecutor to a question asked of Lieutenant Dion Gordon-Byron de Bit. The question sought de Bit's opinion as to the effect of low-level energies upon human cells.

In testifying as to his background and qualifications to testify as an expert, de Bit said that he had worked in the electronics field in the Navy for 20 years, 10 years as an enlisted man and 10 years as an officer. He said that his present job involved the investigation of the transmission of sonic energy through water. He said that although he had never conducted experiments as to the effect of low-level energies upon plant life and the human body, he had read articles on this subject in "Scientific America" [sic], "Nature Magazine," "Radio News" and "Radio Electronics." He held no degrees from any educational institutions.

It is for the trial court to determine, in the exercise of a sound discretion, the competency and qualifications of an expert witness to give his opinion on evidence, and its ruling will not be disturbed on appeal unless a manifest abuse of discretion is shown. (*Pobor* v. *Western Pac. R. R. Co.*, 55 Cal. 2d 314 [11 Cal.Rptr. 106, 359 P.2d 474]; *Huffman* v. *Lindquist*, 37 Cal.2d 465, 476 [234 P.2d 34, 29 A.L.R.2d 485]; *People* v. *Chambers*, 162 Cal.App.2d 215, 220 [328 P.2d 236].) Under the facts presented, the trial court did not abuse its discretion in refusing to permit the witness to answer the question.

Defendant urges that the trial court erred when it permitted Dr. Greenfield to give his opinion as to the effectiveness of the machines received in evidence. Dr. Greenfield testified that he had a Ph.D. degree in physics, and that he was a professor of radiology at the Medical Center of the University of California at Los Angeles, where he was in charge of the radiation physics division. He testified that since 1948 he taught courses to candidates for the M.D. degree and persons having the M.D. degree who were enrolled for additional training at the Medical Center. He specialized in the application of radioactive isotopes to diagnostic medical tests and his teaching included the effects of radiation upon human tissue, the measurement of radiation emitted by the human body and the measurement of radiation used in the treatment of cancer. He testified that he had worked with therapists in planning the use of X-rays and cobalt radiation in the treatment of cancer. Dr. Greenfield's qualifications as an expert were adequately

established. The trial court properly permitted him to state his opinion as to the efficacy of defendant's machines.

Defendant complains that the court erred in ruling that statements made by Underwood outside his presence were admissible against him. In its ruling, the court stated that the statements would be admissible against defendant only if there was a prima facie showing of a conspiracy between defendant and Underwood. The ruling was correct. Once prima facie evidence of the existence of a conspiracy has been received, the evidence of the acts and declarations of an alleged co-conspirator can be received against the other conspirator. (*People* v. *Steccone,* 36 Cal.2d 234 [223 P.2d 17].) However, the order of proof is discretionary with the court and it may admit evidence of the declarations of an alleged conspirator before the necessary proof of conspiracy has been received. (*People* v. *Fratianno,* 132 Cal.App.2d 610 [282 P.2d 1002]; *People* v. *Sica,* 112 Cal.App.2d 574, 584 [247 P.2d 72].) Defendant says that he should have been permitted to inquire on cross-examination of Mr. May, an investigator for the State Board of Medical Examiners, whether the witness or anyone in his office gave notice to defendant that he was using a drug or device contrary to provisions of the Health and Safety Code. The matter was immaterial and the ruling was correct.

It is the duty of the trial judge to restrict the cross-examination of witnesses to reasonable limitations. (*People* v. *Spreckels,* 125 Cal.App.2d 507, 514 [270 P.2d 513].) Defendant argues that the trial court erred when it sustained objections during the cross-examinations of Mrs. Hayes and Mrs. Hubbard to questions asking these witnesses whether they had relied on statements defendant made to them. These witnesses were not named as victims in the theft counts. It was not material or relevant to show the belief of the witnesses as to the conspiracy count. The essential point was what the alleged conspirators agreed to do.

Defendant says that one of the instructions given by the trial court to the jury prejudiced his rights because at one point the word "true" was inadvertently inserted in place of the word "untrue." The passage is as follows:

". . . which is *true* or misleading and which is known, or which may by the exercise of reasonable care should be known to be *untrue* or misleading." (Emphasis ours.)

Since the phrase was immediately repeated in the sentence with the correct word inserted, the jurors must have recognized this verbal slip for what it actually was. A

conflict in the instructions is nonprejudicial if the jurors must have had the correct concept of the law viewing the instructions as a whole. (*People* v. *Baldwin,* 42 Cal.2d 858, 869 [270 P.2d 1028].)

 Defendant objects to the giving of an instruction which told the jury that it need not find that the defendants actually used the criminal means alleged in the conspiracy count, provided they found that a purpose existed to use criminal means, if necessary, to cheat and defraud. This instruction correctly stated the law. It pointed out that the essential fact was what the alleged conspirator agreed to do. (*People* v. *Schmitt, supra,* 155 Cal.App.2d 87, 106.) Defendant next refers to an instruction in which the court said that the jurors would have to determine whether the defendant was able to diagnose illnesses through the use of the diagnostic machine and whether the treatment machines were efficacious in the treatment of diseases. Defendant contends that this instruction was misleading, in that it told the jury that they would have to find that the machines were effective before they could acquit. However, this objection is answered by a reading of the trial court's next instruction, which advised the jury that even if the jury found that the machines were not effective, they would still have to decide whether the defendants, in good faith, believed that the machines were effective. In other words, the jurors were told that they might acquit even if the machines were worthless if they found that defendants believed the machines had some medical value. Defendant's contention that the court should have instructed on what was meant by "efficacious in the treatment of diseases" is without merit. Courts need not instruct on the meanings of ordinary words which have no special legal meaning. (*People* v. *Deibert,* 117 Cal.App.2d 410, 422-423 [256 P.2d 355].) Defendant's last objection to the instructions is that one of them referred to the so-called Koch shot or treatment in the singular form, when, in fact, defendant testified that two solutions having different strengths were referred to as the Koch shot. An examination of the record shows that the singular form was used by the defendant and other witnesses in referring to this treatment. Taken in its entirety, the words used in this instruction would be interpreted as a general reference to the treatment and different solutions used therein. No error to defendant's prejudice appears from these instructions.

 Defendant urges that three instructions which he

requested were not given by the court and that this was error. These instructions, in effect, said that if they found that defendant made any false statements or representations to a patient, the jurors must further find that defendant had a specific intent that such statements or representations would not be beneficial; that if such statements are made by a doctor with the belief that they will aid in curing a patient, they do not violate Penal Code, section 484; and that unless corrupt motives are shown beyond a reasonable doubt, the jurors should acquit the defendants.

The substance of these instructions is that they inform the jury in a particular way that they must find a specific intent to defraud to warrant a finding of guilty. The jurors were instructed as to Business and Professions Code, section 2137, which provides:

"The physician's and surgeon's certificate authorizes the holder to use drugs or what are known as medical preparations in or upon human beings and to sever or penetrate the tissues of human beings and to use any and all other methods in the treatment of diseases, injuries, deformities, or other physical or mental conditions."

The jury was advised that physicians are not authorized to make false representations as to the effect of their method of treatment with the fraudulent intent of obtaining money by false pretenses. The jury was instructed that a necessary element of the crime of obtaining money by false pretenses is the existence in the mind of the perpetrators of a specific intent to defraud, and unless this intent exists, the crime is not committed. This instruction also informed the jury that an intent to defraud is an intent to deceive another person for the purpose of gaining some material advantage over him or to induce him to part with property, or to alter his position to his injury, and to accomplish that purpose by some false statement, false representation of fact, wrongful concealment or suppression of the truth, or by any other artifice or act fitted to deceive.

As was said in *People* v. *Schmitt, supra,* 155 Cal.App.2d 87, 112: "The jury was therefore required, under the instructions given by the court, to consider the question of his good faith, for it could not find an intent to defraud without of necessity making an implied finding that defendant was not acting in good faith. The proposed instructions merely restated the substance of the instructions on specific intent, although negatively and in another form. When a jury is properly in-

structed as to an applicable legal principle, it is unnecessary to restate that principle in another way.''

We do not believe that defendant's instructions were necessary. The instructions that were given were clear and detailed and the jury must have understood that good faith was a defense to the charges.

▇▇▇ Defendant points out that the forms of verdict supplied to the jury by the court did not provide for a finding of petty theft as to counts two and three. The court instructed the jury that if they found that the sums received by the defendant were less than $200, they should find him guilty of petty theft rather than grand theft. The record indicates that the defendant did not object to the form of the verdict or submit any other forms of verdict. In discussing a similar situation, in *People* v. *Hill,* 116 Cal. 562 [48 P. 711], the Supreme Court said, at page 570:

''Whether the omission was inadvertent or intentional does not appear, although from the fact that that degree of the offense was covered by the charge, and that a form of verdict for manslaughter was furnished to the jury, it is highly probable that the omission was unintentional. However that may be, we do not ascribe any such effect to the omission as that suggested by defendant. The law makes it no part of the duty of the judge to furnish forms of verdict to the jury, but the latter are presumed to be able to formulate their own conclusions, and in practice most usually do so. Where, therefore, the jury has been properly instructed as to the different degrees of the offense, it must be presumed that if their conclusion called for a form of verdict with which they were not furnished, they would either ask for it or write one for themselves. It certainly could have no necessary tendency to preclude them from finding such verdict.'' (See also *People* v. *Williams,* 189 Cal.App.2d 254, 264 [11 Cal.Rptr. 142] ; *People* v. *Gonzales,* 187 Cal.App.2d 769 [10 Cal.Rptr. 12] ; *People* v. *Elliott,* 115 Cal.App.2d 410 [252 P.2d 661].)

A number of other contentions are made by defendant in his brief. However, they are not sufficiently substantial to warrant discussion.

Order granting probation affirmed.

Shepard, J., and Coughlin, J., concurred.

A petition for a rehearing was denied September 28, 1962, and appellant's petition for a hearing by the Supreme Court was denied October 31, 1962.