[Crim. No. 3337.   First Dist., Div. One.   Aug. 19, 1958.]

THE PEOPLE, Respondent, v. DOYLE BEASLEY, Appellant.

Markuse & Murray and James Murray for Appellant.

Edmund G. Brown, Attorney General, Clarence A. Linn, Assistant Attorney General, John S. McInerny and Arlo E. Smith, Deputy Attorneys General, for Respondent.

BRAY, J.—Defendant appeals from a judgment entered upon a jury verdict of murder in the first degree with recommendation of life imprisonment.

### QUESTIONS PRESENTED

1. Sufficiency of evidence.
2. Alleged error in admitting evidence of homosexuality.
3. Alleged misconduct of prosecuting attorney.
4. Failure to instruct on motive.

1. *Sufficiency of Evidence.*

Assuming " '. . . in favor of the verdict the existence of every fact which the jury could have reasonably deduced from the evidence . . .' " as we are required to do (*People* v. *Newland* (1940), 15 Cal.2d 678, 681 [104 P.2d 778]) the evidence is amply sufficient to support the verdict.

Sometime between 11 p. m. July 27th and 4 a. m. July 28th deceased was killed near the entrance to his apartment by being shot four times with a .38 caliber revolver. No one saw the shooting. Although when the body was discovered deceased's wallet was missing, the police almost immediately concluded that it was actually a revenge murder or something of that nature. Without detailing all of the facts, the evidence shows that about six months prior to the homicide defendant had a falling out with the victim with whom he had been rooming. He pretended to want to rent an apartment close to where the killing occurred and did occupy it the night of the killing. On the date of the killing defendant was seeking to contact the victim and was using assumed names in doing so, and was in the area of the killing both before and during the time when the killing took place. Defendant showed a consciousness of guilt by admittedly lying to the investigating officers concerning incidents connected with the case and his own activities on the fatal day. The afternoon of the shooting defendant, patting himself at the waist line where there

was a bulge which appeared to be a pistol, told his friend Washington that defendant might get in "serious trouble." After the killing defendant evidenced an almost macabre interest in it. Also he told Washington that the only gun police could tie him in with was in Louisiana and that he had taken the other gun he had and its cartridges and thrown them into the ocean near Fleishhacker pool. (The police dragged that area of the ocean with mine detectors, but were unable to find a gun.) He also said that he had to do what he had done because "this fellow" was going to get him into a lot of trouble and was going to "squeak" to the police and defendant would "get a lot of time." Defendant admitted lying to the police and stating to Washington that he had had to do the killing and had thrown the gun and shells away, but claimed that he said it merely to calm Washington down. Defendant practically admitted to the officers that he had stated to a Miss Winslow that he had been with deceased the night he was killed. Defendant, without any suggestion of the matter having been made by the prosecution, asked a police inspector what one Lopez, who was a fellow prisoner with defendant at the city jail, had told the inspector defendant had told Lopez. The inspector replied that Lopez had said that defendant stated to him that he was in jail on a murder charge and "I did it, but nobody saw me." He then asked Lopez what was the best way to get out of the country. Defendant's denial of the killing and all circumstances therewith merely created a conflict with the other evidence, which conflict the jury resolved against him.

Defendant's statement to Washington as well as other evidence in the case shows premeditation. ▮ The firing of three of the four shots at close range and the evidence that the killer was probably waiting in the doorway supports a verdict of first degree murder on the theory of lying in wait which section 189, Penal Code, so classifies it. (See *People* v. *Tuthill*, 31 Cal.2d 92 [187 P.2d 16], on the subject of what constitutes "lying in wait.") Defendant claims that no motive was shown. ▮ Motive, while oftentimes a valuable, is not an indispensable element of proof. (See *People* v. *Durrant* (1897), 116 Cal. 179, 208 [48 P. 75]; *People* v. *Dessauer* (1952), 38 Cal.2d 547, 551 [241 P.2d 238].) But Washington's testimony that defendant had to do what he had done to keep his victim from telling the police something for which defendant would have to serve time, established a motive. On the question of premeditation our case differs from *People* v.

*Morton* (1947), 79 Cal.App.2d 828, 843 [181 P.2d 32], where veiled threats against his wife were uttered by the defendant many months before the shooting, in that in the instant case defendant on the evening of the shooting disclosed that he was going to get into serious trouble and subsequently admitted the killing and gave as the reason for committing it one which, together with the circumstances of the killing, proved that it was deliberately and premeditatedly committed.

2. *Homosexuality.*

In his opening statement, the prosecuting attorney stated that the prosecution intended to prove that defendant and deceased were homosexuals. Defendant objected that this was not ''proper'' and was ''unfair.'' The court than admonished the jury that any statement of the attorney was not evidence, was not to be considered by the jury as such, and that if evidence were attempted to be introduced on that subject the court would then pass upon the matter. The attorney then stated that the prosecution intended to prove that the breaking up of that relationship was the motive for the murder, and that it would not be offered to degrade or take advantage of defendant, but that it merely would go to the motive. Again the court admonished the jury that the statement was not evidence and that the court would rule upon the subject at the proper time. There was no error here, as the prosecution was entitled to prove that motive if it could, and at this point in the trial the court had the right to assume that the statement was made in good faith. (See *People* v. *Berryman,* 6 Cal.2d 331 [57 P.2d 136]; *People* v. *Granados,* 49 Cal.2d 490 [319 P.2d 346]. See also *People* v. *Northcott,* 209 Cal. 639, 652 [289 P. 634, 70 A.L.R. 806], *People* v. *Mullen,* 115 Cal.App.2d 340 [252 P.2d 19], and *People* v. *Hall,* 27 Cal. App.2d 440 [81 P.2d 248], on admissibility of evidence of sex desires as motive for murder.)

Defendant's cross-examination of Inspector O'Haire appears to be an attempt to show that the police settled upon defendant as the killer without making a thorough investigation of other possibilities and theories, especially that of robbery. A part of the cross-examination follows: ''MR. WAINWRIGHT [defendant's attorney] : Q. Now, Inspector, after having determined that Mr. Martland's bill fold was missing, did you ever pursue the theory that Mr. Martland was the victim of a robbery? A. No, we never pursued that theory, due to the type of gunshot wounds, the type of case it was. Q. . . . .

When you say 'due to the type of case it was' what do you mean? A. Well, during our investigation we questioned homosexuals that were friendly with Martland and also knew Beasley. In fact, Mr. Martland had made a statement to one such person that he was afraid of Beasley.'' No objection to, nor motion to strike this statement was made.

On redirect examination plaintiff called O'Haire's attention to the fact that answering a question by defendant as to whether it was the fact that defendant had lied to him that was the main reason for assuming defendant to be guilty, O'Haire had replied ''That, plus other evidence.'' When asked that he explain that answer, O'Haire stated, ''Yes, there was many factors which indicated that Doyle Beasley was the perpetrator of the crime. We were able to ascertain that Martland was a homosexual and that Doyle Beasley was a homosexual. We were able to determine——'' Defendant moved that the answer be stricken as a conclusion of the witness. Considerable colloquy of court and counsel followed and the court ruled, ''I find nothing in the question, the cross-examination questions that would permit the subject to be pursued any further on re-direct.'' Apparently this was a ruling in defendant's favor. Then plaintiff called O'Haire's attention to his answer hereinbefore set forth to the effect that the police had not pursued a theory of robbery ''due to the type of gunshot wounds, the type of case it was,'' and then asked him to explain that answer. O'Haire replied that in investigating the case, they determined that deceased and defendant were homosexuals. Defendant objected that this was the conclusion of the witness. The court overruled the objection on the ground that the matter was brought out in answer to the question asked by defendant. However, the court ruled, ''due to the type of information that might be elicited, I am going to sustain the defendant's objection to further examination on this subject.''

As stated before, it was the endeavor of defendant to show that the police and particularly Inspector O'Haire selected defendant as the killer and made no effort to pursue other possibilities. Defendant even asked O'Haire if they had considered that the killer might have been a woman. Defendant pursuing this line of questioning and allied lines opened the door for O'Haire to give his reasons for not following other possibilities. ▆▆ ''When a witness is asked 'why?' he may give his reasons whether they be founded upon fact, fiction, or mere suspicion.'' (*People* v. *Page* (1938), 28 Cal.App.2d

642, 649 [83 P.2d 77].) ██ Where on cross-examination as here with O'Haire matters were brought out tending to discredit a witness' testimony, he may make explanations. (See *People* v. *Darr*, 3 Cal.App. 50, 53 [84 P. 457].) In *People* v. *Quock Wong* (1954), 128 Cal.App.2d 552, 554 [275 P.2d 778], the court said: "Upon cross-examination of one of the officers who testified concerning such reputation, defendant developed the fact that upon one occasion he was arrested as a keeper of house of prostitution at this hotel. That, if error, was invited error of which defendant cannot complain. [Citation.] The police officer next called was asked by the state to relate the circumstances of that arrest. . . . The state, relying upon section 1854 of the Code of Civil Procedure and *People* v. *McCarthy*, 25 Cal.App.2d 667 [78 P.2d 252] . . . , claims it was proper for the state to inquire into the whole subject after part of it had been given in evidence by the defendant. That position seems sound." See also *People* v. *Howes* (1950), 99 Cal.App.2d 808 [222 P.2d 969], where the defendant on cross-examination of the employer in a prosecution of the defendant-employee for grand theft tried to show that the books were kept in a slipshod manner. On redirect the witness was allowed to explain why the shortage was not discovered. It was said: "It is quite clear that, even if the objection were timely and should have been sustained to this line of questioning, which is doubtful, the error could not have been prejudicial inasmuch as appellant's counsel had opened the subject on cross-examination and examined the witness at some length." (P. 822.)

██ The evidence was admissible, not for the purpose of proving its truth, but in explanation of the police officer's selection of defendant as the perpetrator of the crime, an explanation of which defendant himself requested.

██ The first time the subject of sex deviation was mentioned, it was done by defense counsel, who asked Washington whether he ever knew defendant "to be perverted or anything of that nature." Washington replied, "Well, no, I can't exactly say that I have never seen anything out of him that——" He then stated that when up to defendant's house they would eat and drink and witness would go about his business and defendant about his. On redirect examination after asking Washington if in answer to a question by defense counsel he had stated that defendant had never "performed any perverted acts" and receiving an affirmative reply, the following occurred: "Q. Weren't you present on Stockton

Street on one occasion—— A. Well, I wouldn't like to talk about that. I didn't—— as far as I know, acted as any other man would. As far as being perverted, I wouldn't say he was. Q. Did you tell me, Mr. Washington, that you—— MR. WAINWRIGHT: I am going to object to this man seeking to impeach—— THE WITNESS: A. I cannot—— THE COURT: Overruled. MR. CAMPBELL [for the prosecution]: Q. Didn't you tell me, Mr. Beasley had performed acts of sodomy in the Stockton Street hotel? A. Yes. Q. He—— A. But, I didn't see him. I wasn't in his room with him at the same time. MR. WAINWRIGHT: Well, now, I am going to move that be stricken. THE WITNESS: A. He told me that he had. MR. CAMPBELL: Q. He told you he had? A. I was not in the house. He told me he had. MR. WAINWRIGHT: I am going to move that be stricken. MR. CAMPBELL: You brought it up. MR. WAINWRIGHT: Certainly.''

Later, defendant moved to strike from the record all testimony concerning homosexuality, including this statement of the witness Washington. The court denied the motion. This motion should have been granted. While it is true that defendant opened the subject on cross-examination and possibly under the rule set forth in *People* v. *Howes, supra,* 99 Cal. App.2d 808, 822, the evidence would have been admissible had it been followed up to show that the acts of sodomy were committed between defendant and the deceased to prove what the prosecuting attorney stated in his opening statement he intended to prove, namely, that the motive of the killing was the estrangement of two homosexuals,* without connecting the acts to the actors in this case the only effect of the testimony could be to degrade the defendant in the eyes of the jury. The fact that he had committed sodomy with a person other than the deceased could not possibly have had any bearing upon the question of whether or not defendant had killed the deceased. The motion to strike was made at the end of the prosecution's case, when it was clear that there was no proof of any homosexual relationship between the two men. The effect of this error will be discussed with the next subject.

---

*We have in mind that sodomy, under the legal definitions, may be committed by humans of opposite sex as well as of the same sex. (See vol. 39, Words and Phrases, p. 559 et seq.) Nevertheless the term as commonly understood and as we believe it would be understood by the jurors is considered to relate only to acts between members of the male sex.

### 3. *Misconduct.*

In his opening argument the prosecuting attorney stated: "The police found out, as you heard from the evidence, that Richard Martland was a homosexual and so was the defendant Doyle Beasley. They found out from Pat Creegan, as you heard in the evidence, that the two men had lived together; had had a falling out and that Martland had moved out." In his argument, defense counsel pointed out that the prosecution had failed to prove that the homosexual relationship existed between the two men, and that the inspector's assumption that such relationship existed was merely to slander and degrade defendant.

In his closing argument the prosecuting attorney stated: "We, who are in law enforcement work, ladies and gentlemen, we see homosexuals, sex perverts and criminals that sometimes we don't understand why an average, normal citizen, who doesn't come in contact with them the way we do, is at a loss to understand the motives or reasons that cause them to act the way they do. In a homosexual relationship, there is always, just as in a normal male-female relationship, the loved one and the lover. Passions and jealousies between homosexuals are even more exaggerated than they are in normal people." Here defendant objected and asked that the jury be admonished. The court overruled the objection. The prosecuting attorney continued: "A rebuffed homosexual is in the same position as a woman scorned. Doyle Beasley, ladies and gentlemen, did not hate Richard Martland. On the contrary, he loved him. But, he had been rebuffed. He had been turned down and tossed aside and when he talked to Ralph Washington on July 27, 1956, his course was already set. He had made up his mind what he was going to do and he indicated to his friend, Ralph, just what he intended to do." These statements were highly improper. No homosexual relationship between the two men had been proved. The theory upon which the inspector could properly mention the subject was not to prove the fact, but to answer defendant's probing as to why the police finally concluded that defendant was the perpetrator of the murder. (The inspector testified that the police before coming to that conclusion had investigated every person who they could learn had known the deceased.)

The error in the failure of the court to strike the sodomy testimony and the statements of the prosecution above mentioned, coupled with the fact that the record shows that the

prosecution from the very opening statement on, engaged in a course of conduct that must have been deliberately intended to improperly prejudice defendant and to deprive defendant of a fair trial, was prejudicial  Homosexuality is a subject upon which the public generally looks with disfavor. It is a disgusting subject to some and a distasteful subject to others.  Although the prosecution stated at the beginning that it intended to prove a homosexual relationship between deceased and defendant, it made no effort to do so.  It must have known that Washington would mention "sodomy" in answer to its question and that unless connected with the deceased such evidence was inadmissible.  It must have known that Inspector O'Haire's testimony was inadmissible to prove the fact of homosexuality, and yet it argued to the jury that homosexuality had been proved, and the prosecuting attorney, in effect, testified to the jury the experience of "We, who are in law enforcement work" with homosexuals.  Then in both his opening and closing arguments it engaged in a discussion which was clearly erroneous, and could not be anything but prejudicial.  The whole course of conduct was designed to prejudice the defendant. This deliberate and continuous conduct should not be condoned. A course of conduct can deprive a defendant of a fair trial even though each individual error is unimportant.  (4 Cal.Jur.2d p. 506.)  The evidence was circumstantial and to a considerable degree depended upon whether the jury believed Washington or defendant.  It is very doubtful whether with the prosecution arguing that homosexuality had been proved, the jury could objectively weigh the conflict between the two.  Applicable here is the following from *People* v. *Beal,* 116 Cal.App.2d 475, 478 [254 P.2d 100] : "It has been said many times that a district attorney may strike hard blows, but he is not at liberty to strike foul ones.  Here he struck foul ones."  ▮ Also applicable is our statement in *People* v. *Talle,* 111 Cal.App.2d 650, 676-677 [245 P.2d 633] : "It hardly needs citation of authority that an argument by the prosecution that appeals to the passion or prejudice of the jury, . . . that uses evidence admitted for a limited purpose as substantial evidence of the facts there recited . . . is erroneous and prejudicial."  (See also *People* v. *Hidalgo,* 78 Cal.App.2d 926, 938-949 [179 P.2d 102].)

4. *Instructions.*

▮ Defendant offered no instruction on motive, and

contends that the court should have given one on its own motion. ▉ While the trial court has the duty to instruct the jury on the law applicable to the case, it has no duty to instruct on any specific subject developed by the evidence unless there is a request from one of the parties to do so. (*People* v. *Klor,* 32 Cal.2d 658, 661-662 [197 P.2d 705]; *People* v. *Reinschreiber,* 141 Cal.App.2d 688, 699 [297 P.2d 658].) ▉ In *People* v. *Landry,* 106 Cal.App.2d 8, 15 [234 P.2d 736], it was held that the trial court is not required on its own motion to instruct on motive. One of the reasons there given is that proof of motive is never indispensable to a conviction. Moreover, how an instruction on motive would have helped defendant is difficult to perceive. Washington's testimony that defendant said he had to do what he did to keep deceased from ''squeaking'' on him about a matter for which defendant felt he would get ''a lot of time'' supplied motive.

The judgment and order denying new trial are reversed.

Peters, P. J., and Wood (Fred B.), J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied October 15, 1958.