[Crim. No. 11337. First Dist., Div. Two. Mar. 28, 1974.]

THE PEOPLE, Plaintiff and Respondent, v.
RUSSELL STANLEY BEYEA et al., Defendants and Appellants.

COUNSEL

Gregory C. Dyer, under appointment by the Court of Appeal, Frank D. Rothschild, Filippelli & Eisenberg and Gilbert Eisenberg for Defendants and Appellants.

Evelle J. Younger, Attorney General, Edward A. Hinz, Jr., Chief Assistant Attorney General, William E. James, Assistant Attorney General, John T. Murphy and Jean M. Bordon, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**TAYLOR, P. J.**—Codefendants appeal from judgments[1] entered on jury verdicts finding them guilty of second degree murder (Pen. Code, § 187). Both urge reversal or, in the alternative, reduction of the sentences to manslaughter, on the grounds that: 1) the evidence was insufficient to sustain the verdict and conviction; 2) the trial judge abused his discretion in allowing reference to their membership in the Hell's Angels; 3) the admission of the testimony of two witnesses from the preliminary hearing was improper as the prosecution failed to exercise due diligence to ensure their appearance at trial; 4) they were deprived of their right to confrontation as the prosecution was permitted to impeach the testimony of its own preliminary hearing witnesses with prior hearsay statements; and 5) there were instances of prejudicial prosecutional misconduct. Gilbert individually argues that: 1) the prosecution was guilty of several acts of misconduct; 2) misstated the law of accomplices in its argument; and 3) the trial court erred to his prejudice as it failed to rule that Hunter was an accomplice as a matter of law. Beyea individually contends that the court below: 1) failed to give *sua sponte* the refused cautionary instruction on oral admissions by defendants; 2) wrongfully instructed the jury on murder by torture; 3) erroneously denied a motion for a new trial on the basis of newly discovered material evidence; and 4) allowed to a prosecution eyewitness a discriminatory grant of immunity subsequently denied to a potential defense eyewitness. For the reasons stated below, we have concluded that both convictions should be affirmed.

---

[1]Gilbert's notice of appeal also indicates that his appeal is from the sentence (Pen. Code, § 1237) which provides that a sentence shall be considered a final judgment within the meaning of the section.

Viewing the facts in the light most favorable to the judgments, the following appears: On February 24, 1972, Beyea and Gilbert were sitting in Connie Perry's kitchen. Beyea was 6′ 1″ tall and weighed 265 pounds; Gilbert was 6′ tall and weighed 205 pounds. Also present in the house were Ms. Perry, Paul Kindem, Dennis Sanders, Ms. Perry's "old man," and Frank Hunter, also known as "Lurch." Both Beyea and Gilbert were members of the Hell's Angels. Gilbert wanted some parts from a motorcycle in the basement, so he and Ms. Perry left the kitchen and went downstairs to the basement. The basement was divided into two rooms. The entrance to the basement opened into the larger room that contained a pool table; from this room there was an opening to a smaller room that contained two motorcycle frames. The lighting in the smaller room was fair.

At approximately 6 p.m., Bradley Parkhurst, the decedent, arrived at the residence with his friend, Clyde Burk, and entered the smaller basement room, then occupied by Ms. Perry and Gilbert, who was working on one of the two motorcycle frames. Parkhurst was 5′ 10″ tall, weighed 167 pounds, and was carrying a pool cue. After Ms. Perry introduced Parkhurst to Gilbert, and the two shook hands. Gilbert said "That's a Nigger's handshake." Parkhurst responded "I'm no Nigger." Gilbert and Parkhurst argued and a fight erupted. Burk testified[2] that he did not observe who struck the first blow, but Parkhurst knocked Gilbert down. Parkhurst and Gilbert fought on the ground. At first, Parkhurst was getting the better of the fight.

Ms. Perry left the basement, ran into the kitchen upstairs and said "Russ, Marv is in trouble." Beyea then ran out the back door, followed by Hunter and Sanders. Beyea entered the basement first, pushed Burk against the wall, and ordered him to stay there. Hunter observed Gilbert staggering in the corner, and saw Beyea hit Parkhurst twice in the mouth with his fist. Hunter shoved Burk up against a wall. Hunter testified[3] that he kept Burk against the wall for about a minute to a minute and a half, although Burk testified that he was held up against the wall for 15 or 20 minutes, as long as the fighting lasted.

Hunter testified that he could see out of the corner of his eye that Beyea and Gilbert were hitting Parkhurst. Hunter saw Gilbert hit Parkhurst once, he thought in the chest. Burk testified that he could see some black boots that appeared to be making a motion to kick. Burk heard a thud, and then Parkhurst's voice, "It's cool. Stop." Burk heard Parkhurst repeat this sev-

---

[2]Burk's testimony at the preliminary was read into the record after the trial court held that due diligence had been exercised.

[3]Hunter's testimony at the preliminary was read into the record after the same ruling.

eral times and also heard Parkhurst moaning. Burk also heard some slapping noises and saw Parkhurst being thrown against a bicycle frame. Kindem was then brought into the larger basement room by Sanders, who had told him "They want to talk to you downstairs." Burk heard Parkhurst being asked his name, and then heard the fighting noises begin again.

Kindem testified that he saw Hunter holding Burk against the wall with one hand and holding a hammer in the other. From the pool table room, Kindem could hear noises from the other room, including Parkhurst saying "Hey, Brother, I know you from the compound." A voice answered, "You don't know me. I wasn't out there last year," and then "Well, let me see your wallet. Give me your wallet." Beyea then walked into the pool room, pointed his finger at Kindem's face and said, "You didn't see nothing and you didn't hear nothing." Kindem replied, "You are right. I didn't." Kindem heard moaning and coughing from the other room while Beyea was talking to him; Beyea said "Well, don't worry; nothing is going to happen to you."

Kindem then heard Gilbert say "Well, how come you tell me your name is this and it says in your wallet your name is something else? Now, what's your name?" and then "What is your fucking name, Man?" Then followed a thud which Kindem testified resembled a kick. Parkhurst said "No more, please. I've had enough." The moaning sound grew louder after the sound resembling a kick.

Gilbert said: "Shut up, punk. I don't dig snivelers," and "You know, I am not going to ask you one more time. If you don't tell me your name you are not going to leave here alive." Beyea then said "You'd better answer if you know what's good for you." Parkhurst replied "I've told you my right name," and continued to choke and moan. Kindem observed Hunter release Burk. Burk saw Parkhurst lying on his back, his face bloody. Gilbert resumed work on the motorcycle and left a few minutes later with Beyea. Hunter testified that he had heard Gilbert ask Parkhurst whether he was all right before leaving, to which Parkhurst replied "Yes."

After Gilbert and Beyea left the basement, Hunter, Kindem and Burk, with Sanders' assistance, made efforts to revive Parkhurst for approximately three and one-half hours after the latter suffered a convulsion. Hunter injected Parkhurst twice with methamphetamine; after the second shot, given about 15 minutes after Gilbert and Beyea's departure, there were no more sounds from Parkhurst. Burk gave Parkhurst mouth-to-mouth resuscitation, and Kindem massaged Parkhurst's heart, in spite of the fact that he could hear no heart beat or respiration. Kindem gave Parkhurst two more injections, to no avail. Kindem was unable to inject into a vein because there

was no blood flowing. Around 9 or 9:30, Hunter, Sanders, Kindem, and Burk left the basement. Burk drove Parkhurst to Highland Hospital where he told a doctor that Parkhurst had had an overdose.

An autopsy was performed on Parkhurst on February 25 by Dr. Allan B. McNie, who testified at trial. The autopsy disclosed numerous wounds suffered within the preceding 24 to 48 hours. Dr. McNie testified that Parkhurst had sustained multiple superficial abrasions and lacerations of the head, back and extremities. Parkhurst's front tooth was found in his stomach. Parkhurst's injuries were consistent with being caused by blows, kicks or strikes with a blunt instrument. The injuries to the extremities were consistent with having been caused by kicks as if decedent were trying to protect himself. Methamphetamine and amphetamine were found in decedent's body, but Dr. McNie testified that neither contributed to Parkhurst's death.

Dr. McNie found three internal areas of hemorrhage: one two-inch area in the abdominal wall to the left of the umbilicus, and two one-inch areas at the lower rib margin. The three internal areas of hemorrhage could have resulted from multiple blows. Dr. McNie testified that the cause of death was a laceration of the spleen and the resulting massive loss of blood into the abdominal cavity. Further, Parkhurst's spleen was abnormally large as the result of chronic intravenous administration of amphetamines and heroin; his spleen weighed 400 grams as opposed to a normal 200 to 225 grams. In Dr. McNie's opinion, it would take a less violent blow to cause a laceration of decedent's spleen than it would to cause the laceration of a normal spleen. A person with an enlarged spleen can live for years without a rupture. A normal spleen may rupture if sufficient trauma is applied to the area. Dr. McNie believed that the rupture of the decedent's spleen was not caused by the heart massage. In the doctor's opinion, the decedent's body was, at a minimum, subjected to 15 to 20 applications of blunt force. The laceration of the spleen was caused by a blunt injury. The three internal areas of hemorrhage were consistent with kicks, and with the injury which brought about the rupture of the spleen.

I. Beyea and Gilbert's joint contentions on appeal.

 Both defendants first argue that the evidence is insufficient to sustain the verdicts of second degree murder. Murder is the unlawful killing of a human being, with malice aforethought (Pen. Code, § 187). Malice may be express or implied. "It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature. It is implied, when no considerable provocation appears, or when the circum-

stances attending the killing show an abandoned and malignant heart" (Pen. Code, § 188). As there was no substantial evidence of express malice, defendants' convictions must rest upon sufficient evidence to sustain the jury's finding of implied malice.

Defendants rely on *People* v. *Munn* (1884) 65 Cal. 211, 213 [3 P. 650], where the court said: "If the means employed be not dangerous to life, or, in other words, if the blows causing death are inflicted with the fist, and there are no aggravating circumstances, the law will not raise the implication of malice aforethought, which must exist to make the crime murder." In *Munn,* the defendant had struck only two or three blows to the decedent's head. The record before us here, however, evidences the requisite "aggravating circumstances" not present in *Munn.* The beating was prolonged for 15 to 20 minutes, during which time the decedent coughed, moaned, and repeatedly pleaded with defendants to stop. The injury to decedent's arms and legs were consistent with having been inflicted by kicks while he was on the floor trying to protect himself. The decedent was subjected, at a minimum, to 15 to 20 applications of blunt force. After the beating was over, decedent was lying on his back with blood on his face and mouth. Gilbert resumed work on the motorcycle frame, and both defendants left the basement soon afterward. Given the circumstances of this beating, we cannot say that there was no substantial evidence to support the finding of implied malice (see *People* v. *Breland* (1966) 243 Cal.App. 2d 644 [52 Cal.Rptr. 696]).

■ Defendants further argue that because of the vulnerable state of Parkhurst's enlarged spleen, his death or serious bodily injury was not the probable result of their acts. However, Dr. McNie testified that a normal spleen will rupture if sufficient trauma is applied. The laceration of decedent's spleen was caused by a blunt injury, the areas of internal hemorrhage were consistent with kicks and with causing the injury to the spleen. The jury could, therefore, reasonably conclude that decedent's death was caused by kicks administered by defendants. Defendants further argue that errors in the trial, such as prosecutional misconduct, led the jurors to imply malice where there was none, citing *People* v. *Teixeira* (1955) 136 Cal.App.2d 136 [288 P.2d 535]. However, the errors complained of here are not of comparable magnitude to those in *Teixeira,* where the prosecutor stated to the jury that the defendant had offered to plead guilty to manslaughter, and that the defendant was a pimp, a matter not in evidence.

■ The circumstances surrounding the incident also afford substantial evidence that there was no sufficient provocation. Although the record does not show who struck the first blow, the evidence does reveal that Gil-

bert provoked the argument by scorning Parkhurst's handshake. While the decedent was apparently getting the better of the fight with Gilbert at first, the testimony at trial affords ample evidence that Parkhurst was at the mercy of both defendants.

█ The jury was also warranted in rejecting defendants' claims of self-defense. █ The law of self-defense is based on the reasonable appearance of imminent peril of death or serious bodily injury (*People* v. *Keys* (1944) 62 Cal.App.2d 903 [145 P.2d 589]). It is also clearly the law that the use of excessive force destroys the justification for the use of force (*People* v. *Harris* (1971) 20 Cal.App.3d 534 [97 Cal.Rptr. 883]). █ The jury could well conclude that defendants used excessive force and continued to do so long after the decedent had been disabled.

█ Both defendants next contend that the trial court erred in admitting the testimony of Burk and Hunter given at the preliminary examination. The transcripts were deemed admissible as prior recorded testimony under Evidence Code section 1291, as the witnesses were "unavailable" within the meaning of Evidence Code section 240, subdivision (a)(5). Defendants assert that the court abused its discretion in admitting the testimony as the prosecution failed to exercise "reasonable diligence" to insure the appearance of Burk and Hunter at trial. As the determination as to whether due diligence has been shown rests largely within the discretion of the trial judge (*People* v. *Benjamin,* 3 Cal.App.3d 687 [83 Cal.Rptr. 764]), and the record reveals timely and extensive efforts to locate the missing witnesses, we must reject this contention.

Both Burk and Hunter appeared voluntarily to testify at the preliminary hearing. Burk appeared frightened when told that the hearing would be public and that members of the Hell's Angels were in the audience. Nonetheless, he agreed to appear at the trial. Hunter's appearance at the preliminary examination was obtained through his lawyer, Richard Bartalini. Hunter informed the deputy district attorney in charge of the preliminary examination that he was afraid of the Hell's Angels and had been in hiding. Although he refused to give the deputy a phone number or location where he could be reached, Hunter did agree to testify at the trial, and told Bartalini how he could be reached.

William E. Eller, an inspector with the Alameda County District Attorney's office, testified at the trial as to his efforts to locate Burk and Hunter. His testimony reveals repeated efforts to locate Burk at his home, his grandmother's home, and at a former place of work in a park. While Eller was speaking with Burk's former supervisor, two people informed them that "If those two dudes are from the district attorney's office, tell them that

they won't find Clyde because the Hell's Angels have them. [*Sic.*]" Eller also checked with relatives, friends and neighbors, police and sheriff's departments, public utilities, the post office, and the decedent's wife. Burk contacted his girl friend and grandmother, mother and a friend several times during the search, but each time refused to reveal his whereabouts. He also seemed quite frightened and at times heavily drugged. Burk stated to his grandmother that the authorities should have taken him into protective custody if they had wanted him to testify.

Eller's efforts to locate Hunter were less comprehensive but were reasonable under the circumstances of this case. During the search for Hunter, Eller had been assured by Bartalini that he could assure Hunter's presence at trial. Bartalini had located Hunter for the preliminary examination. Nevertheless, Eller conducted his own independent search, and contacted the county welfare department, Pacific Telephone and Telegraph Company, the post office, the Department of Human Resources, and three labor union locals, with no success. Eller also contacted the Los Angeles Police Department, local police departments, the visitors' log at the Alameda County Sheriff's Department, and the decedent's wife.

Defendants argue that Eller's efforts were insufficient, given the fact that the prosecution should have been aware of the potential difficulties of locating the absent witness. The district attorney at trial did acknowledge that "in a Hell's Angels' case I always anticipate a witness problem." In particular, defendants argue that the prosecution was negligent in not serving a subpoena upon Hunter when he appeared at the preliminary examination on June 16. However, the trial date was not set until June 28. Defendants' contention is, therefore, without merit (*People* v. *Benjamin* (1970) 3 Cal.App.3d 687, 696 [83 Cal.Rptr. 764]). Nor would there have been any practical significance in forwarding subpoenas to Plumas County or to Bartalini under these circumstances, as Hunter was aware that he was the subject of a search, but was afraid to testify.

Defendants also contend that the prosecution was dilatory in commencing its search for Hunter and Burk. On June 28, 1972, the case was set for trial on July 19, 1972. On July 11, 1972, defendants entered a conditional waiver of time, and on July 28, 1972, the trial was continued to July 31, 1972. Before July 11, 1972, Eller made some preliminary phone calls to locate the witnesses, and on that date began keeping a log of his activities in the search. As trial began on July 31, 1972, Eller devoted much of his time for almost three weeks to the search. Furthermore, the lapse of approximately two weeks in beginning the search is not comparable to the lapse of six weeks deemed fatal in *People* v. *Harris* (1968) 266 Cal.

App.2d 426 [72 Cal.Rptr. 423]. Furthermore, one factor to be considered in determining the sufficiency of the proponent's efforts is whether the witness has purposefully sought to conceal himself (*People* v. *Banks* (1966) 242 Cal.App.2d 373 [51 Cal.Rptr. 398]).

Given Eller's efforts to secure Hunter and Burk, and their assurances at the preliminary examination that they would testify at trial, it cannot be said that the prosecution failed to meet its duty of due diligence.

█ Defendants contend[4] that their constitutional confrontation rights were denied and compromised when the trial court allowed the prosecution to impeach its own witnesses, Hunter and Burk, by admitting their prior inconsistent statements over defense objections. This contention presents a question of first impression as to the construction of Evidence Code section 1202.

At trial, the prosecution was first permitted to read into evidence preliminary examination testimony of two of its witnesses, who were eyewitnesses, Frank Hunter and Clyde Burk. Both Hunter and Burk had disappeared before the trial began and were ruled "unavailable" witnesses within the meaning of Evidence Code section 240, subdivision (a)(5). The preliminary hearing testimony of both was favorable to the prosecution; in fact, Hunter's testimony was essential to the prosecution's case against Gilbert.

The trial court, over a defense objection pursuant to Evidence Code section 1202, then permitted the prosecution to impeach certain parts of the preliminary hearing testimony of Hunter and Burk by admitting into evidence their prior inconsistent hearsay statements. Both hearsay statements, Burk's made at the preliminary examination of Dennis Sanders, another witness to the crime, on April 24,[5] and Hunter's to the police on March 8, provided more specific details as to the extent of defendants' participation in the altercation. Both hearsay statements, therefore, tended to impeach Burk and Hunter's more general testimony at the preliminary hearing.[6] The prosecution was thus able to use the hearsay statements of

---

[4]Although raised on appeal only by Gilbert, the record indicates that both defendants below objected on this ground.

[5]Both statements had been made prior to defendants' preliminary examinations on June 6 and 16, 1972. In fact, Burk's statement at the preliminary of Sanders was elicited by the same district attorney who subsequently questioned him at defendants' preliminary hearing. At the time of Sanders' preliminary examination on April 24, 1972, neither of the defendants had yet been charged with the crime; the record indicates that both were first charged on June 27, 1972.

[6]Burk's preliminary examination testimony that he "didn't see a boot strike anything" was impeached by his prior statement that "I got a glance at one boot kicking

Hunter and Burk to shore up its case, without entirely destroying the credibility of their preliminary hearing testimony. Defendants contend that their constitutional confrontation rights were denied and compromised by the admission of these hearsay statements.

Read literally, the language of Evidence Code section 1202 appears to permit the impeachment of a witness with a prior inconsistent statement by the party who called the witness. That statute provides that evidence of a prior inconsistent statement to rebut an admissible hearsay statement of that witness is not inadmissible even though the declarant ". . . is not given and has not had an opportunity to explain or to deny such inconsistent statement or other conduct." However, the Law Revision Commission's comment to section 1202 states that the statute provides "a uniform rule permitting a hearsay declarant to be impeached by inconsistent statements in all cases, whether or not the declarant has been given an opportunity to explain or deny the inconsistency. If the hearsay declarant is unavailable as a witness, the party *against whom* the evidence is admitted should not be deprived of both his right to cross-examine and his right to impeach" (italics added). Here, defendants were the parties "against whom" the impeaching statements were admitted, as Hunter and Burk furthered the prosecution's case as they more specifically supplemented the rather general nature of their testimony as to defendants' active participation in the crime.

In *Am-Cal Investment Co.* v. *Sharlyn Estates, Inc.* (1967) 255 Cal. App.2d 526 [63 Cal.Rptr. 518], the court further explained the rationale underlying the Law Revision Commission's comment to Evidence Code section 1202: "The purpose of allowing extrajudicial inconsistent statements is to be fair to the party *against whom the hearsay was received inasmuch as he was denied the opportunity of cross-examination;* thus, *such party should at least be allowed to impeach the declarant by admitting the declarant's own statements which are inconsistent with the declaration received in evidence.* [Citation.]" (*Id.* at p. 542; italics supplied.) Witkin appears to agree that where, as here, when the hearsay declarant is unavailable as a witness, the thrust of Evidence Code section 1202 is to permit the party *against* whom hearsay has been admitted (and who has not been able to cross-examine) to impeach the witness with prior inconsistent hearsay statements that do not have to be explained (Witkin, Cal. Evidence (2d ed. 1966) § 1274).

him"; Hunter's preliminary examination testimony that he "never saw Gilbert strike Parkhurst," was impeached by his prior statement that he "saw Gilbert strike Parkhurst on the chest with his fists."

Defendants correctly contend that the time for the introduction of the statements in question was at the preliminary hearing because of the foundational requirement that the witness be afforded the opportunity to explain any apparent inconsistencies (Evid. Code, §§ 769, 770, 1235, 1290, 1291). The court in *People* v. *Collup,* 27 Cal.2d 829, 836 [167 P.2d 714], explained the general rule " 'A witness may also be impeached by evidence that he had made, at other times, statements inconsistent with his present testimony; but before this can be done, the statements must be related to him, with the circumstances of times, places, and persons present, and he must be asked whether he made such statements, and if so, allowed to explain them.' (Code Civ. Proc., § 2052.) However, we do not believe that the foundation requirement is necessary where it is impossible to comply with it due to no fault of the party urging the impeachment." Here, the prosecution had actual knowledge of Burk's April 24 statement and at least constructive knowledge of Hunter's March 8 statement prior to defendants' preliminary examination and, for this additional reason, should not have been permitted to further its own case by impeaching its own witnesses with their prior inconsistent hearsay statements.

■ Defendants further argue that this denial of their Sixth Amendment right to confrontation so prejudiced the outcome of the trial as to require a reversal. We cannot agree. We are aware of the importance of the right of confrontation of witnesses (see *Chambers* v. *Mississippi* (1973) 410 U.S. 284 [35 L.Ed.2d 297, 93 S.Ct. 1038]). We are convinced, however, that, under the circumstances of this case, the error in admitting the hearsay statements was harmless beyond a reasonable doubt *(Chapman* v. *California,* 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065]). There was overwhelming evidence, without the hearsay statements of Burk and Hunter used to impeach their testimony given at defendants' preliminary examinations, that placed Beyea and Gilbert at the scene of the crime, and that defined their role in the fight as aggressors. In fact, the very testimony given by Hunter and Burk that the prosecution, for some reason, found necessary to impeach, clearly connected both defendants with the crime.

■ Defendants next urge that the trial court abused its discretion in permitting reference to be made to their membership in the Hell's Angels, as the inflammatory effect on the jury exceeded the probative value of the evidence (Evid. Code, § 352). Defendants' motion was denied as the trial court determined that defendants' membership would be admissible solely to show their identity and motive. ■ It is settled law that the chief elements of probative value are relevance, materiality and necessity *(People* v. *Schader* (1969) 71 Cal.2d 761 [80 Cal.Rptr. 1, 457 P.2d 841]). Proof

of the presence of motive is material as evidence tending to refute or support the presumption of innocence (*People* v. *Miller* (1960) 185 Cal.App. 2d 59, 71 [8 Cal.Rptr. 91]). In a prosecution for murder, proof of motive is material to a finding of premeditation and deliberation (*People* v. *Anderson* (1968) 70 Cal.2d 15 [73 Cal.Rptr. 550, 447 P.2d 942]).

■■■ "[B]ecause a motive is ordinarily the incentive for criminal behavior, its probative value generally exceeds its prejudicial effect, and wide latitude is permitted in admitting evidence of its existence [citations]." (*People* v. *Lopez* (1969) 1 Cal.App.3d 78, 85 [81 Cal.Rptr. 386]). ■■■ Both the trial judge and the prosecutor admonished the jury that evidence of defendants' membership was admitted only for the limited purpose of showing identity and motive. Defendants urge, however, that the similar cases of *People* v. *McKee* (1968) 265 Cal.App.2d 53 [71 Cal. Rptr. 26], and *People* v. *Sawyer* (1967) 256 Cal.App.2d 66 [63 Cal.Rptr. 749], require a reversal in this case.

The court in *McKee* acknowledged the popular prejudice against the Hell's Angels. "Most of the northern California public regard Hell's Angels or members of a motorcyclists' organization of that name with distaste, a fact of which we take judicial notice." (*Id.* at p. 59.) In that case, the court found no error as only two jurors had read a newspaper article regarding the trial, which identified the defendants as Hell's Angels. In *Sawyer,* the same court noted that "Limited comment on defendants' membership was within the realm of fair argument, since the prosecution was attempting to show a conspiratorial scheme by the group to avenge an insult against a wife of one member." (*Id.* at p. 79) As proof of the defendants' membership in the Hell's Angels was relevant to proof of motive and was material and necessary, we cannot say that the trial court erred in concluding that the evidence's probative value outweighed its prejudicial effect.

The trial court had ruled prior to *voir dire* of the jury that Kindem's testimony that Beyea was wearing the Hell's Angels' "colors" would be admissible. Having made this decision, the trial judge was under a clear duty to insure during *voir dire* that the jury selected be free from prejudice against the group (Pen. Code, § 1078). In fact, two jurors were excused who admitted bias towards the Hell's Angels. It was also necessary for the trial judge to *voir dire* the prospective jurors on the subject, as defendants pointed out that the Oakland Tribune on the preceding day had printed an article about the trial referring to the Hell's Angels. In order to inquire whether the venuemen had read the article, the trial judge reasoned that it was necessary to raise the subject of Hell's Angels' membership. Further, no error can be predicated on the prosecutor's reference to the evidence

in his opening statement as the evidence was later properly admitted *(People* v. *Tolbert* (1969) 70 Cal.2d 790, 802 [76 Cal.Rptr. 445, 452 P.2d 661]; *People* v. *Beasley* (1958) 163 Cal.App.2d 22, 26 [328 P.2d 834]).

Defendants also charge that the prosecution was guilty of three instances of prejudicial misconduct that requires reversal: 1) the arguments about the Hell's Angels exceeded the scope of fair comment; 2) the personal belief expressed as to the guilt of both defendants; and 3) the personal belief expressed as to the credibility of the witnesses. Gilbert further contends that the prosecutor commented on his failure to testify, misstated the law, and urged the jury to disregard the law.

We agree with the contention that the prosecutor's comparison of defendants' actions to those of Hitler's Brown Shirts, Mussolini's people in Italy, and Tojo's in Japan, the Ku Klux Klan, and George Lincoln Rockwell's people, overstepped permissible bounds of fair comment. Although there was no overt reference to the Hell's Angels at this point in the argument, the analogy intended must have been clear to the jury. As reference to defendants' membership in the Hell's Angels was admissible only for the narrow purpose of showing identity and motive, these remarks were unnecessary and improper. Defendants, however, did not object to these statements, or request that the jury be admonished. As this was not a case where there was grave doubt of defendants' guilt, and the harmful effects of the prosecutor's statement could have been cured by an admonition from the court, defendants may not complain on appeal *(People* v. *Crawford* (1967) 253 Cal.App.2d 524 [61 Cal.Rptr. 472]).

Defendants argue that the prosecutor expressed a personal belief in their guilt when he read, without identification, a quotation from Mr. Justice White's dissenting opinion in *United States* v. *Wade,* 388 U.S. 218, at page 256 [18 L.Ed.2d 1149, at page 1174, 87 S.Ct. 1926], contrasting the duties of the district attorney and defense counsel: "Law enforcement officers have the obligation to convict the guilty and to make sure they do not convict the innocent . . ." whereas defense counsel is said to have ". . . no comparable obligation to ascertain or present the truth." Viewed in the context of the entire final argument, however, the statement may well be interpreted as rebuttal to the deprecatory remarks made by Gilbert's counsel against the prosecutor. Counsel argued that the prosecutor's job is to convict, and characterized the prosecution's argument to the jury as inflammatory and dishonest. He also suggested that the prosecutor was on an ego trip and had engaged in theatrics. Under these circumstances, the prosecutor's reading of the above quotation without identification was proper (see *People* v. *Stuller* (1970) 10 Cal.App.3d 582, 600 [89 Cal.Rptr.

158, 41 A.L.R.3d 712], cert. den., 401 U.S. 977 [28 L.Ed.2d 327, 91 S.Ct. 1205]).

■ Defendants further charge that the prosecutor expressed a personal belief as to the credibility of witnesses. The record indicates that the prosecutor argued that although Hunter testified, he was careful to avoid specifically identifying Beyea and Gilbert as the individuals who did the kicking and beating. The prosecutor referred to the fact that on cross-examination Hunter testified that he could not be sure whether he had seen Gilbert strike the decedent; he also compared the testimony of Hunter and Burk relating to Parkhurst's physical condition at the end of the fight. As the comment on Hunter's bias was warranted by the evidence, it did not constitute misconduct.

## II. Gilbert's individual contentions.

■ Gilbert asserts that the prosecutor attacked Burk's credibility from his own knowledge by stating that "a fellow that Burk did not identify . . . would not identify . . . but who Luch told us was Marvin Gilbert—was inside the basement . . .," and that Burk "was just a little too scared to tell us" the truth of the matter. Given that at the preliminary examination, Burk had testified that he had seen the boot making a kicking motion but had not observed it strike anything, whereas in prior testimony, Burk had testified: "I got a glance at one boot kicking him," and Burk's expressed fears of the Hell's Angels, the prosecutor's argument was a proper deduction from the evidence.

■ Gilbert also argues that it was misconduct for the prosecutor to argue the truth of words admitted under Evidence Code section 1241[7] solely for the purpose of explaining Kindem's conduct when Sanders said to him: "They want to talk to you downstairs." The prosecutor, in his closing argument, referred twice to Sanders' statement as evidence of Beyea and Gilbert's criminal intent. ■ Argument of matters outside the record is clearly improper (*People* v. *Edgar* (1917) 34 Cal.App. 459 [167 P. 891]). However, "[t]he ultimate question which must be answered is whether the conduct of the district attorney was prejudicial, that is, after a review of the entire cause, is it reasonably probable that a result more favorable to the defendant would have occurred had the district attorney refrained from the comment attacked by the defendant. [Citations.]" (*People* v. *Beivelman*

---

[7]Section 1241: "Evidence of a statement is not made inadmissible by the hearsay rule if the statement:

"(a) Is offered to explain, qualify, or .make understandable conduct of the declarant; and

"(b) Was made while the declarant was engaged in such conduct."

(1968) 70 Cal.2d 60, 75 [73 Cal.Rptr. 521, 447 P.2d 913]). ■ As there was substantial evidence of defendants' guilt, there is no reversible error.

■ Gilbert argues that the prosecution misstated the law of accomplices in bad faith in his closing argument, as follows: "Now, if you are going to say that he is an accomplice would you convict him on that evidence? If Frank Hunter was here in this courtroom, from what you heard, would you convict him of murder? He didn't touch the victim; he didn't talk to the victim; he didn't kick the victim; he tried to save his life. Does that make him an accomplice? That's what Wagner says. He says in effect you don't have enough evidence to convict his client or Beyea but you have got enough evidence to convict Hunter," and further, "There is no evidence here to show you that the intent on the part of Hunter was to kill or to torture or to cause pain and suffering . . ." However, viewed in the context of the prosecution's argument, these comments may be viewed as relating the facts of this case to the proper summary of the law of accomplices which the prosecutor had given previously.

Gilbert also suggests that another statement of the prosecutor constituted a suggestion to the jury to disregard the rule that the testimony of an accomplice must be corroborated. However, as this statement was immediately followed by a correct statement of the law of accomplices, it is apparent that the whole discussion was merely a discussion of whether Hunter was an accomplice.

■ Gilbert next asserts that the prosecutor, in fact, invited the jury to ignore the rule requiring corroboration of an accomplice's testimony. However, viewed as a whole, the paragraph in question (set forth below)[8] is more reasonably interpreted as an argument that the evidence was insufficient to establish that Hunter's status was that of an accomplice. It should be noted that any ambiguities remaining after the prosecution's closing argument as to the law of accomplices would have been dispelled by the court's instructions to the jury before the commencement of their deliberations, and again, on their request, during the course of deliberations.

---

[8]"There is no evidence here to show you that the intent on the part of Hunter was to kill or to torture or to cause pain and suffering or anything other than to either save that man's life or make sure he didn't say anything, because he wasn't involved or he didn't want to be involved. Now, on the other hand, if you were to say 'Okay, he is an accomplice, you know, and for that reason Gilbert is out,' I say to you that that would be a misfinding of what the evidence is, but that's your job. I think if the law required that, that Shakespeare, or at least one of Shakespeare's characters would have been right when it said 'The law is an ass' because the law doesn't require that kind of a solution or an ending. You look at the law and Hunter is not an accomplice because he may not be a desirable character to take home for you or with you or live next door, but that doesn't make him a murderer, and the defendants are."

Gilbert also claims that the prosecutor indirectly commented on his failure to testify, by stating that ". . . do you know what the greatest way to get the truth is? Cross-examination. It is the greatest thing ever found by this court of law. You take a man up there and you can drag the truth out of him. It's an opportunity that I didn't have with any defense witnesses because they never produced witnesses that said what went on." Viewed in the light of the fact that the prosecutor had previously remarked on the defendants' failure to produce witnesses to testify to injuries sustained by them, or to produce any alibi witnesses, the above statement must be viewed as referring not to the defendants, but to the lack of witnesses for the defense. Such a comment on the failure to call material and important witnesses can be considered by the jury and commented on by the prosecuting attorney (*People* v. *Chandler* (1971) 17 Cal.App.3d 798, 805-806 [95 Cal.Rptr. 146]).

Gilbert further argues that the trial court erred in failing to instruct the jury that Hunter was an accomplice as a matter of law. An examination of the record reveals, however, that Gilbert's counsel made a deliberate tactical decision to accede to the giving of the instructions that left that question to the jury. Previously, the trial court had ruled that the prosecution would not be allowed to introduce evidence of defendants' attempts to flee, as the prejudicial effect would outweigh the probative value. Evidence of flight may warrant an inference of consciousness of guilt, and may be sufficient to corroborate the testimony of an accomplice (*People* v. *Perry* (1972) 7 Cal.3d 756 [103 Cal.Rptr. 161, 499 P.2d 129]). Later, the trial court indicated that if he were to rule as a matter of law that Hunter was an accomplice, he would allow the prosecution to reopen its case to introduce evidence of flight. In response, counsel for Gilbert stated, "I withdraw the proffered instruction for the Court to make its finding at this time based upon the fact that the Court would allow the District Attorney to reopen." If counsel expresses a deliberate tactical purpose in suggesting, resisting, or acceding to an instruction, the trial court is no longer obligated to instruct on the matter (*People* v. *Graham*, 71 Cal.2d 303 [78 Cal.Rptr. 217, 455 P.2d 153]). Gilbert is now precluded from raising this matter on appeal.

III. Beyea's individual contentions on appeal.

Beyea first argues that the failure of the trial judge to give, *sua sponte*, the cautionary instruction regarding his implied admission constitutes reversible error. The rule relating to instructions a trial judge is required to give without request is ". . . the court has a duty to give instructions on the general principles of law governing the case, even

though not requested by the parties, but it need not instruct on specific points developed at the trial unless requested" *(People* v. *Wade* (1959) 53 Cal.2d 322-334 [1 Cal.Rptr. 683, 348 P.2d 116]). ██ Based on this standard, it has been held that the cautionary instruction regarding implied admissions must be given *sua sponte (People* v. *Henry,* 22 Cal.App.3d 951 [99 Cal.Rptr. 723]). The statements of each of the defendants (set forth below)[9] were highly incriminating, and contributed to establishing the element of malice, essential to a verdict of second degree murder (Pen. Code, § 187, subd. (a)). However, the omission of the instruction "does not constitute reversible error if upon a reweighing of the evidence it does not appear reasonably probable that a result more favorable to defendant would have been reached in the absence of the error [citations]." *(People* v. *Beagle* (1972) 6 Cal.3d 441, 455 [99 Cal.Rptr. 313, 492 P.2d 1]). Here, decedent's multiple injuries, the unequal terms of the fight, the decedent's cries of pain and pleas for the beating to cease establish ample substantial evidence to sustain the jury's finding of malice. As it does not appear reasonably probable that a result more favorable to defendants would have been reached had the jury been given the required cautionary instruction, the omission of such an instruction does not constitute reversible error *(People* v. *Watson* (1956) 46 Cal.2d 818 [299 P.2d 243]).

██ Beyea next asserts that the trial court committed reversible error by instructing the jury on murder by torture.[10] ██ In order to support an instruction on murder by torture, the evidence must demonstrate that "the assailant's intent was to cause cruel suffering on the part of the object of the attack, either for the purpose of revenge, extortion, persuasion, or to satisfy some other untoward propensity" *(People* v. *Tubby* (1949) 34 Cal.2d 72, 77 [207 P.2d 51]). In *People* v. *Anderson* (1965) 63 Cal.2d 351 [46 Cal.Rptr. 763, 406 P.2d 43], the Supreme Court held that it was reversible error to instruct on murder by torture where the sole evidence relating to the element of intent was the mutilated condition of the victim's body. The court noted that "Those cases in which this court has upheld convictions of murder by torture have all involved some evidence tending

---

[9]Gilbert: "Shut up, punk, I don't dig snivelers." "You know, I am not going to ask you one more time. If you don't tell me your name you are not going to leave here alive."

Beyea: "You'd better answer if you know what's good for you."

[10]"In the crime of murder in the first degree there must exist in the mind of the perpetrator the specific intent to kill or torture . . ."

"Murder which is perpetrated by torture is murder of the first degree. The essential elements of such a murder are: 1. The act or acts which caused the death must involve a high degree of probability of death, and 2. The defendant must commit such act or acts with the intent to cause cruel pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose." (CALJIC No. 8.24).

to prove the requisite intent." (*Id.* at p. 359.) Here, the circumstances surrounding the killing as well as the condition of decedent's body afforded sufficient evidence to sustain a theory of murder by torture. If we discount Gilbert and Beyea's actual threats to the decedent, the circumstances of the beating still suggest that the motive for the prolonged beating given the decedent was a desire to punish Parkhurst for his audacity in greeting Gilbert with a "Nigger's handshake," and for continuing to struggle with him over the incident.

Even assuming, without conceding, that the murder by torture instruction was error, defendants are not entitled to a reversal. "[T]he giving of such an instruction does not justify a reversal of the judgment unless it is affirmatively shown that the error would prejudice the rights of the defendant" (*People* v. *Eggers* (1947) 30 Cal.2d 676, 687 [185 P.2d 1]). Here, although given first degree murder instructions (Pen. Code, § 189), the jury returned a verdict of second degree murder. Nonetheless, Beyea argues that as the jury was instructed that it would be permitted to "give the benefit of the doubt" and return a verdict of second degree murder, the instruction was prejudicial. However, the jury was properly instructed that murder is the unlawful killing of a human being with malice aforethought, and that manslaughter is the unlawful killing of a human being without malice aforethought. "[B]efore the question can arise of whether a killing is murder of the first degree because committed by one of the enumerated means [of Pen. Code, § 189], it must first be established that the killing was with malice aforethought" (*People* v. *Mattison* (1971) 4 Cal.3d 177, 183 [93 Cal.Rptr. 185, 481 P.2d 193]). Defendant can, therefore, claim no prejudice from the fact that the jury was instructed as to murder by torture.

 Beyea further contends that the trial court abused its discretion in denying his motion for a new trial on the ground of newly discovered evidence. In support of the motion, Beyea submitted a handwritten statement made by Gilbert that was presented to Beyea on August 28, 1972, and the declaration of William G. Mortensen, an investigator for Beyea's attorney, stating that during an August 16 conversation in the Alameda County Courthouse jail, Gilbert had made substantially the same statements as those contained in the written statement. Mortensen further stated that he was prepared to testify at a new trial as to the contents of the statement if Gilbert were unwilling to so testify. In opposition to the motion for a new trial, the prosecution submitted the affidavit of Gary

Schellenberg, the bailiff of the trial court.[11] Schellenberg declared that after the jury had returned its verdict on August 17 and had been excused, an individual wearing a belt buckle with the Hell's Angels' insignia pointed to Gilbert and said, "Ain't no place you can hide, Marv." Schellenberg further declared that while Beyea and Gilbert were en route to the county courthouse jail, Beyea said to Gilbert, "If I get anything out of this, you've got an ass kicking coming."

 The granting or denial of a motion for a new trial on the ground of newly discovered evidence is a matter which lies within the sound discretion of the trial court (*People* v. *Hill* (1969) 70 Cal.2d 678 [76 Cal. Rptr. 225, 452 P.2d 329], cert. den., 406 U.S. 971 [32 L.Ed.2d 671, 92 S.Ct. 2416]). However, in ruling on the motion, the trial court must consider the following factors: 1) that the evidence, and not merely its materiality, is newly discovered; 2) that the evidence is not merely cumulative; 3) that it would render a different result probable on retrial of the cause; 4) that the party could not with reasonable diligence have discovered and produced it at trial; and 5) that these facts have been shown by the best evidence of which the case admits (*People* v. *Williams* (1962) 57 Cal.2d 263, 270 [18 Cal.Rptr. 729, 368 P.2d 353]).

 Gilbert's statement, if believed, would fully exculpate Beyea, as it portrays Beyea's role in the incident as solely that of a peacemaker. However, the trial court may consider the credibility as well as materiality of the evidence in its determination whether introduction of the evidence in a new trial would render a different result reasonably probable (*People* v. *Sousa* (1967) 254 Cal.App.2d 432, 435 [62 Cal.Rptr. 44]). Gilbert's statement conflicts with testimony adduced at trial; the statement itself recites that it conflicts with his prior statement given to the police. The statement also implicates Hunter as an active participant in the beating; Hunter was an essential witness against Gilbert. Hunter testified that he observed Beyea hit Parkhurst twice in the mouth while the statement recites that Beyea only intervened to separate the combatants. Furthermore, the trial court could properly conclude that the statement was the result of fear and coercion. Although Gilbert informed Mortensen on August 16 of the substance of the statement, he did not give the written statement to Beyea until August 28. Given the threats to Gilbert made on August 17, the trial court could conclude that the statement was not credible and thus would not render a different result reasonably prob-

---

[11]Mr. Schellenberg's affidavit was not included in the record on appeal. Accordingly, on the court's own motion, the record should be augmented. (Cal. Rules of Court, rule 12 (a).)

able on trial (*Chapman* v. *California,* 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065]).

 Finally, Beyea asserts that the grant of immunity pursuant to Penal Code section 1324[12] to Frank Hunter, a prosecution eyewitness, but not to Ms. Perry, a potential defense eyewitness, constituted a policy of unfair and unequal law enforcement. However, it has been repeatedly held that California's immunity statute is constitutional. "The decision as to who shall be granted immunity is ultimately a legislative function. [Citations.] Necessarily prosecuting attorneys must exercise considerable discretion in this area, subject to the guidelines established by the Legislature. [Citations.] The Fourteenth Amendment to the United States Constitution does not require that the power to trigger the effect of a law such as section 1324 of the Penal Code which the Legislature has vested in the district attorney must also be exercisable by a defendant. Clearly a legislature can react differently to the probable motives of a prosecutor who requests immunity, and those of a defendant in a criminal case." (*People* v. *Traylor* (1972) 23 Cal.App.3d 323, 332 [100 Cal.Rptr. 116]).

---

[12]Section 1324: "(a) In any felony proceeding, in any investigation or proceeding before a grand jury for any felony offense, or in any investigation of a criminal organization or organized crime and its activities conducted by the Attorney General, if a person refuses to answer a question or produce evidence of any other kind on the ground that he may be incriminated thereby, and if the district attorney of the county or the Attorney General in writing requests the superior court for that county to order that person to answer the question or produce the evidence, 'a judge of the superior court shall set a time for hearing and order the person to appear before the court and show cause, if any, why the question should not be answered or the evidence produced, and the court shall order the question answered or the evidence produced unless it finds that to do so would be clearly contrary to the public interest, or could subject the witness to a criminal prosecution in another jurisdiction, and that person shall comply with the order. After complying, and if, but for this section, he would have been privileged to withhold the answer given or the evidence produced by him, that person shall not be prosecuted or subjected to penalty or forfeiture for or on account of any fact or act concerning which, in accordance with the order, he was required to answer or produce evidence. But he may nevertheless be prosecuted or subjected to penalty or forfeiture for any perjury, false swearing or contempt committed in answering, or failing to answer, or in producing, or failing to produce, evidence in accordance with the order.

"(b) As used in this section, 'criminal organization' means the formation into a functioning whole of a group of people unified for the purpose of performing together, through planning and coordination of individual effort, continuing activities, a substantial portion of which activities are illegal. Indicative that a group of persons constitutes a criminal organization are the following important, though not indispensable, factors: the continuation of activity by the organization, though its personnel may change, and the formation of lines of authority in which responsibility is delegated and duties are assigned.

"(c) As used in this section, 'organized crime' means criminal organizations and their activities."

It is settled law that, absent a policy of unfair and unequal law enforcement, the prosecution may select the codefendant or coconspirator to whom immunity will be given (*People* v. *Boehm* (1969) 270 Cal.App.2d 13 [75 Cal.Rptr. 590]). Here, as Ms. Perry left the basement shortly after the fight erupted between Parkhurst and Gilbert, her testimony could reasonably have been considered to be of minimal significance. Hunter, on the other hand, was in the basement during the entire duration of the fight, and could testify from his own personal knowledge to the events that transpired there. There was, then, no policy of unfair and unequal law enforcement.

Reviewing the entire record, we find that the errors we have found in the proceedings below are harmless as the likelihood of material influence is not within the realm of reasonable possibility (*Chapman* v. *California,* 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065]).

The record is augmented to include the affidavit of Mr. Schellenberg. The judgments are affirmed.

Kane, J., and Rouse, J., concurred.

Petitions for a rehearing were denied April 26, 1974, and appellants' petitions for a hearing by the Supreme Court were denied May 22, 1974.